Paul LaFORGE, Plaintiff–Appellant,

v.

THE AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, Defendant–Appellee.

No. 92–3454.

United States Court of Appeals, Tenth Circuit.

Oct. 3, 1994.

---

**4.** The defendant's motion to transfer *in camera*    pleadings is granted.

. Michael F. Saunders of Spencer Fane Britt & Browne, Kansas City, MO (Donald W. Giffin, with him on the brief), for plaintiff-appellant.

Michael P. Tone of Peterson & Ross, Chicago, IL (Kristi A. Gleim of Peterson & Ross and Richard T. Merker of Wallace, Saunders, Austin, & Enochs, with him on the brief), for defendant-appellee.

Before BALDOCK, BRORBY, and EBEL, Circuit Judges.

EBEL, Circuit Judge.

Plaintiff–Appellant Paul LaForge ("LaForge") appeals the district court's grant of summary judgment against him in his suit for a declaratory judgment that he was entitled to coverage for a claim under a directors' and officers' liability policy stemming from his service as a director for a savings and loan association. The insurer, American Casualty Co., asserted that his thrift had provided it insufficient notice of the claim to trigger coverage under the policy. After the district court agreed with American Casualty's argument, LaForge brought this appeal. We affirm.

## I. FACTS

LaForge was a director of the Peoples Savings and Loan Association (the "thrift") in Parsons, Kansas until February 11, 1985. LaForge resigned from the directorship because he believed that a number of the transactions the management entered into were imprudent and that he had not been adequately informed of the thrift's investments. He noted these reasons in his letter of resignation to the thrift's president, which was not passed along to the thrift's insurer.

The thrift had purchased a directors and officers liability policy from the MGIC Indemnity Corp., with a policy period from February 1983 to February 1986. MGIC's policy obligations were assumed by the American Casualty Co. in November 1983.

The thrift failed in 1989, and was placed into receivership, with the RTC as receiver. In 1992, the RTC brought a civil action against the officers and former officers of the thrift, including LaForge, alleging negligence, gross negligence, and breach of their fiduciary duty. LaForge requested that American Casualty company defend him under the provisions of the directors and officers liability policy. American Casualty refused to defend LaForge because, it claimed, neither LaForge nor the thrift gave it notice of a claim during the policy period. LaForge then brought this action for a declaratory judgment to establish that the thrift provided adequate notice of occurrences that might give rise to a claim in a policy renewal application submitted to American Casualty on October 25, 1985.

The thrift's directors and officers liability policy was a claims made policy, as opposed to an "occurrence" policy. Thus, American Casualty insured against claims brought against the insured during the policy period,

whether or not the occurrence triggering the claim took place within the policy period. The policy was somewhat different from the pure claims made policy, because it allowed the thrift coverage for certain occurrences during the policy period that could subsequently develop into a claim against it provided that notice was given to the insurer during the policy period:

> If during the policy period the Association or the Directors or Officers shall: ... (ii) become aware of any occurrence which may subsequently give rise to a claim being made against the Directors and Officers, or any of them, for a Wrongful Act; and shall, during such period, give written notice thereof to the Insurer as soon as practicable and prior to the date of termination of the policy, then any claim which may subsequently be made against the Directors or Officers arising out of such Wrongful Act shall, for the purpose of this policy, be treated as a claim made during the policy year in which such notice was given.

MGIC Policy, § 6(A), Aplt.App. at 24. Thus, the policy would provide coverage to the thrift and its officers if, within the policy period, they provided written notice of occurrences that might give rise to a claim for a wrongful act. A "wrongful act" is defined in section 1(E):

> The term "Wrongful Act" shall mean any actual or alleged error, misstatement, misleading statement, act or omission, or neglect or breach of duty by the Directors or Officers in the discharge of their duties solely in their capacity as Directors or Officers of the Association....

LaForge asserts that a 1985 application for a renewal of the insurance policy and the subsequent investigation by American Casualty provided adequate notice to trigger coverage. LaForge claims that the answer and attachment to question 12(c) of the application provided notice. Question 12(c) asks whether any director or officer was aware of "[a]ssets subject to criticism as substandard, doubtful or loss, the total of which exceeds 25% of capital." The thrift replied yes and attached a sheet that listed seven "Mortgage Loans Classified Substandard." Two of these loans, the Champions Green II and the Newport North Associates loans, were eventually the subject of the RTC suit. The attached sheet listing the loans was from a report of an examination by the Federal Home Loan Bank Board, performed in 1984. In the attachment, the thrift noted that both loans were current, one with interest rate concessions and the other with a "loan in process." Several other loans listed on the attachment had similar comments, such as "Loan was paid off with no loss of principal" and "Loan is current with interest payments being made from Loan in Process." The application also asked whether any of the officers were aware of any "[s]ignificant violations of laws and regulations," to which the thrift answered "no".

After the receipt of the application, one of American Casualty's underwriters, Spero Argyris, investigated the issues in the application, including the two loans that were to be part of the RTC suit. Argyris noted that the thrift's financial condition was deteriorating. He also investigated why LaForge quit, and was told that LaForge did so, of his own desire, to spend more time with his personal business. He noted that the Federal Home Loan Bank Board had criticized the thrift's substandard assets, but commented that "these have been for the most part corrected."

Argyris recommended renewal of the policy. The renewal policy reduced the amount of coverage from $1 million to $500,000, and included endorsements in the policy that excluded certain risks from coverage, such as any claims brought by or on behalf of regulatory agencies, by or on behalf of LaForge, and for "any loan which has been charged off as loss, is sixty (60) days or more delinquent in repayment according to its terms, or is defined as Scheduled Items." Aplt.App. at 219. LaForge claims that these limitations indicate that the insurer had actual notice of potential claims against the directors and officers of the thrift. American Casualty claims, substantiated by affidavit, that the endorsement excluding coverage for departing directors was a regular practice of Argyris and not a specific reaction to possible claims against the thrift.

On cross-motions for summary judgment, the district court granted summary judgment for American Casualty, finding that neither the thrift nor LaForge had given the insurer any notice of actual or potential claims. The district court also found, as a matter of Kansas law, that the insurer need not have been prejudiced by late notice to avoid liability under a "claims made" policy. LaForge appeals the district court's determination that the thrift had not provided adequate notice of an occurrence that could give rise to a claim.

## II. DISCUSSION

■ We review the grant of summary judgment de novo, using the same standard as the district court. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). Summary judgment is appropriate where there is no genuine dispute over a material fact, viewing all evidence and inferences in favor of the party opposing the motion for summary judgment. *Russillo v. Scarborough,* 935 F.2d 1167, 1170 (10th Cir.1991).

■ Under Kansas and general common law relating to the interpretation of insurance contracts, we are bound by clear and unambiguous language, construing the document as a whole. *Phico Ins. Co. v. Providers Ins. Co.,* 888 F.2d 663, 667 (10th Cir.1989) ("[C]ourts will not make contracts under the guise of judicial interpretation, but must enforce them in accordance with their clear and unambiguous language."). The test for determining the meaning of a contract provision is not what the insurer intended, but "what the reasonable person in the position of the insured would understand it to mean." *Coleman Co., Inc. v. California Union Ins. Co.,* 960 F.2d 1529, 1532 (10th Cir.1992) (quoting *American Media, Inc. v. Home Indem. Co.,* 658 P.2d 1015, 1019 (Kan.1983)).

■ LaForge argues that information contained in the thrift's renewal application sufficed to put American Casualty on notice of occurrences that might have given rise to claims against the directors of the thrift. We disagree.

■ The policy that protected LaForge was a claims made policy. Under a claims made policy, coverage is only triggered when, during the policy period, an insured becomes aware of and notifies the insurer of either claims against the insured or occurrences that might give rise to such a claim. This differs significantly from an "occurrence" policy, in which coverage attaches automatically whenever a covered occurrence takes place within the effective dates of the policy.

■ In a "claims made" policy, the notice is the event that invokes coverage under the policy. Clear notice of a claim or occurrence during the policy period is crucial, because allowing actual notice beyond the policy period would "constitute[ ] an unbargained-for expansion of coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy." *American Cas. Co. v. Continisio,* 17 F.3d 62, 68 (3d Cir.1994) (quoting *Zuckerman v. National·Union Fire Ins. Co.,* 100 N.J. 304, 495 A.2d 395, 406 (1985)). Claims made policies are often a more economical way to provide coverage for risks like professional responsibility, because the notice requirements allow an insurer to "close its books" on a policy at the expiration date and thus "attain a level of predictability unattainable under standard occurrence policies." *F.D.I.C. v. Mijalis,* 15 F.3d 1314, 1330 (5th Cir.1994) (quoting *Burns v. Int'l Ins. Co.,* 709 F.Supp. 187, 191 (N.D.Cal.1989), *aff'd,* 929 F.2d 1422 (9th Cir.1991)).

> Notice in a "claims made" policy provides the insurer with the knowledge that after a certain date the insurer is no longer liable under the policy, and accordingly allows the insurer to more accurately fix its reserves for future liabilities and compute premiums with greater certainty. Such a policy reduces the potential exposure of the insurer, thus reducing the policy cost to the insured.

*F.D.I.C. v. St. Paul Fire and Marine Ins. Co.,* 993 F.2d 155, 158 (8th Cir.1993) (citation omitted).

■ With this understanding of the nature of claims made insurance contracts, we agree with the Third Circuit that:

Because the notice of claim provision defines coverage under this policy, the only reasonable interpretation of the policy provision is that the insureds must regard the information they possess as a potential claim and formally notify their insurer through its claims liability department that a claim may be asserted. .

*Continisio*, 17 F.3d at 69. *See also Mijalis*, 15 F.3d at 1335 ("[T]he proper focus of the district court's inquiry is whether the insured has *objectively* complied with such a notice provision, and not whether the insurer has subjectively drawn inferences that potential claims exist from the materials submitted by the insured."). .The information contained in the thrift's renewal application in this case was insufficient to constitute notice of an occurrence "which may subsequently give rise to a claim being made against the Directors and Officers ... for a Wrongful Act." MGIC Policy § 6(A), Aplt.App. at 24. The policy unambiguously requires the insured to give notice of: 1) an occurrence; 2) that might give rise to a claim against the officers or directors; for 3) a wrongful act, as defined in the policy.

■ The thrift's renewal application did not provide this information, in part, because of the context in which the information was provided. It was provided in an application form designed to seek a continuation of coverage from the insurer's underwriters, rather than in a document designed to seek recovery under the policy in effect at the time through American Casualty's claims mechanism. Although that fact would not by itself necessarily be fatal, it requires an unmistakably clear, unequivocal, and conspicuous statement of a claim in such a context to satisfy the notice requirements of the insurance contract.

Nowhere in the renewal application is there notice of an "occurrence" or any "Wrongful Act." *See St. Paul*, 993 F.2d at 159 (thrift did not provide notice in renewal application which disclosed credit overlines when the application "did not indicate any occurrences" and "nothing in the renewal application itself effectively described a claim or potential claim"). Here, the thrift listed seven loans that had been labelled "substand-

ard" by the Federal Home Loan Bank Board, two of which became the subject of a RTC suit. However, the application gives no indication of what the "occurrence" that La-Forge now hopes to rely upon might have been, nor are any Wrongful Acts identified, nor does the application state that the thrift is thereby making a claim under its existing insurance policy. *See American Casualty Co. of Reading, Pa. v. F.D.I.C.*, 944 F.2d 455, 460 (8th Cir.1991) (renewal application that revealed that problem loans at a bank totalled almost 200% of the bank's capital and that a cease and desist order from the Comptroller of the Currency was outstanding did not constitute adequate notice); *Mijalis*, 15 F.3d at 1334–35 (renewal application that listed classified loans and disclosed the existence of a cease and desist order against the bank was not sufficient notice).

Indeed, at the time of the renewal application, the thrift listed as "current," the status of the two loans that became the subject of the RTC suit. Further, the thrift's application claimed that it had not been alerted to any possible violations of laws or regulations. Far from intending to put the insurer on notice of past problems likely to lead to claims against the directors, the application played down any problems both generally and with regard to the two listed loans that became the subject of the RTC suit. "Insureds may not deny knowledge of potential claims in their renewal application and rely on information submitted with the same application to support an argument that the insurer should have known a claim could be made." *Continisio*, 17 F.3d at 69. On a similar set of facts, the Western District of Oklahoma noted that:

Taking the [insured's] argument to its logical conclusion would result in a situation where the bank directors and officers would be better served to disguise potential claims so that they would be covered by insurance well into the future while not drawing attention to conduct that might increase future premiums, or terminate coverage altogether.

*American Cas. Co. of Reading, Pa. v. F.D.I.C.*, 821 F.Supp. 655, 664 (W.D.Okla.

1993), *aff'd* 33 F.3d 62, 1994 WL 387891 (10th Cir. July 26, 1994).

LaForge argues that the insurer's investigation of the thrift's health to determine whether to renew the policy shows that the thrift had notice of occurrences that could give rise to claims against the directors. In *Phico,* we applied Kansas law to hold that an insurance company could waive its right under an insurance contract without an express forfeiture clause to receive written notice of a claim where the insured provided: 1) "timely and adequate oral notice" to the insurer's claims manager; and 2) the insurer acted on "the notice given to undertake an adequate investigation in order to determine its rights and liabilities." *Phico,* 888 F.2d at 669. However, we do not need to determine whether Oklahoma would follow a similar rule because, as noted above, we do not find that the information contained in the renewal application constituted adequate notice. *See Mijalis,* 15 F.3d at 1336 ("[T]here is a substantial difference between an insurer being on notice that an insured is a poor risk for future insurance, and its having received the specific notice required under [the terms of the D & O policy].") (quoting *F.D.I.C. v. Continental Cas. Co.,* 796 F.Supp. 1344, 1353 (D.Or.1991)). Additionally, there is no evidence here that the insurer investigated the issues in the renewal application to determine its "rights and liabilities" as a claims matter under the existing policy. There is a difference between investigating circumstances to determine whether to extend coverage in the future and investigating possible liabilities under a present policy. "[T]he information needed, or at least the perspective utilized in reviewing it, varies when predicting the probability of future losses and recognizing the need to investigate a claim that may be based on past occurrences." *Continisio,* 17 F.3d at 69.

Similarly, the fact that American Casualty changed the coverage in the renewal policy does not indicate to us that it had notice of occurrences that could give rise to claims under the previous policy. American Casualty's exclusion of bad loans from coverage and reduction of coverage reflected the insurer's desire to minimize future risk rather than an acknowledgment of a receipt of notice. "[A change in coverage] does not prove that the financial information conveyed to [the insurer] by the Bank objectively rose to the level of notice of specific wrongful acts. It reflects only that [the insurer] made a 'reasonable business decision' ... when confronted with the Bank's financial weakness." *Mijalis,* 15 F.3d at 1336 (quoting *American Cas.,* 944 F.2d at 459). *See also St. Paul,* 993 F.2d at 157 (court found notice in a renewal application insufficient even though insurer did not renew the policy based on the information in the application).

The result we reach is consistent with recent cases in other circuits. *E.g. Resolution Trust Corp. v. Artley,* 24 F.3d 1363 (11th Cir.1994) (no notice where bank had sent insurer financial documents showing a deteriorating financial condition, bad loans and real estate, and criticism of loans and practices by the Federal Home Loan Bank Board); *Continisio,* 17 F.3d at 67–70 (no adequate notice from a renewal application with auditor's reports that noted serious financial problems); *Mijalis,* 15 F.3d at 1334–37 (renewal application that disclosed existence of cease and desist order against the bank and a list of classified loans did not constitute notice); *McCullough v. Fidelity & Deposit Co.,* 2 F.3d 110, 112–13 (5th Cir.1993) (no notice where bank provided information to insurer about increasing loan losses and delinquencies as well as the existence of a cease and desist order against the bank); *St. Paul,* 993 F.2d at 158–60 (no notice where renewal application contained information that the bank had extended credit beyond legal limit, that certain listed loans exceeding 25% of the bank's capital were substandard, and that there had been significant violations of laws or regulations, because the application asserted that the bank was unaware of acts or omissions that might give rise to claims); *American Cas.,* 944 F.2d at 460 (renewal application revealing that bank would lose $400,000, that the percentage of assets that were classified as problems totalled almost 200% of the bank's capital, and that the bank was subject to a cease and desist order did not constitute notice); *California Union Ins. v. American Diversified Sav. Bank,* 914 F.2d 1271, 1276–78 (9th Cir.1990) (no notice where letter from

insurance broker noted that the financial difficulties of the bank made it difficult to obtain coverage), *cert. denied,* 498 U.S. 1088, 111 S.Ct. 966, 112 L.Ed.2d 1052 (1991).

Accordingly, we AFFIRM the district court's grant of summary judgment to American Casualty.