**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 3 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

FLETCHER D. SAPP and
RUTH SAPP,

      Plaintiffs-Appellants,

v.

LEOPOLD H. GREIF,

      Defendant,

----------------------------------------------

NATIONAL UNION FIRE
INSURANCE COMPANY
OF PITTSBURGH,

      Garnishee-Appellee.

No. 97-3200
(D.C. No. 96-2003-JWL)
(D. Kan.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRORBY**, **BARRETT**, and **BRISCOE**, Circuit Judges.

---

[*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Plaintiffs Fletcher and Ruth Sapp obtained a judgment for over $900,000 in a state court action against defendant Leopold Greif relating to his activities in administering loans plaintiffs obtained from Midland Bank of Kansas while he was a bank officer and director. They then brought this garnishment action against National Union Fire Insurance Company, which had issued a directors and officers liability policy to Midland.[1] National Union removed the case to federal court. On cross-motions for summary judgment, the district court granted National Union's motion, concluding that Greif had released National Union from liability under the policy and, alternatively, that National Union had not received timely notice of plaintiffs' claim. See Sapp v. Greif, 961 F. Supp. 243 (D. Kan. 1997). The court denied their motion for reconsideration. See Sapp v. Greif, 173 F.R.D. 531 (D. Kan. 1997). Proceeding pro se as they did in the district court, plaintiffs appeal.

---

[1] The policy also covered a variety of other related financial institutions that are apparently all related to Midland Bancor, Inc., but these other institutions are not involved in or relevant to this litigation. In this decision, we use the term "Midland" to refer only to Midland Bank of Kansas.

These general facts are not disputed. Plaintiffs' claim against Greif related to activity involving loans they obtained from Midland on February 7, 1991. Sometime in late 1992, National Union issued a directors and officers liability policy to Midland covering the period July 1, 1992 to July 1, 1993. Also sometime in late 1992, National Union became aware that two of Midland's officers had been indicted for misapplication of bank funds and that Greif had reached an agreement with federal banking regulators that barred him from participating in the management of his banks, including Midland, and required him to pay $2.7 million to cover losses by his banks because of bad loans.[2] In April 1993, the Federal Deposit Insurance Corporation took over as receiver of Midland, and on June 30, 1993, the FDIC provided notice to National Union of a variety of claims it might have under the policy.

In November 1993, National Union filed a declaratory judgment action in federal court against Midland, the FDIC, Greif and others, National Union Fire Ins. Co. v. Midland Bancor, Inc., No. 93-2467 (D. Kan. filed Nov. 12, 1993), seeking to rescind the policy on the basis that the application Midland submitted to obtain the policy was fraudulent. In April 1994, plaintiffs filed a state court action against Midland, the FDIC, Greif, and another officer, Sapp v. Midland

---

[2] The precise dates when National Union issued the policy and became aware of misdeeds by Midland's directors and officers are disputed.

Bank of Kansas, No. 94C4066 (Kan. Dist. Ct., Johnson County, filed April 11, 1994), and alleged, against Greif, fraud, negligence, misrepresentation, and breach of fiduciary duty in addition to other claims relating to activity involving the February 1991 loans. In February 1995, Greif notified National Union of plaintiffs' claims against him. In April 1995, National Union, FDIC, Greif and others entered into a settlement agreement (the "FDIC settlement") under which National Union agreed to dismiss its rescission action. The FDIC settlement provided in part that

> the Settling Defendants [officers and directors of Midland including Greif], on behalf of themselves individually, and their respective heirs, executors, administrators, agents, representatives, successors and assigns, hereby release and discharge National Union, its parents, subsidiaries, affiliates and reinsurers, and their respective employees, officers, directors, agents, representatives, successors and assigns, from any and all claims, demands, obligations, damages, actions and causes of action, direct or indirect, in law or in equity, that arise from or relate to the Policy with regard to:
>
> 1.   Any and all claims which are expressly released herein by the FDIC;
>
> 2.   Any and all claims which are expressly reserved herein by the FDIC; and
>
> 3.   Any and all claims by any person or entity against any of the Settling Defendants in their capacities as directors and/or officers of the Banks, Concord Bancshares, Inc., TIC, Inc., and Midland Capital Corp.

R. Vol. 3, Doc. 74, ex. R at 6-7. In May 1995, National Union and Greif entered into a separate settlement agreement (the "Greif settlement") involving Greif's

claim for costs for defending various suits including plaintiffs' state court action against him. Pursuant to the Greif settlement, National Union agreed to pay Greif $90,000 "as reimbursement for a portion of Greif's costs incurred in defending the claims against him" in return for Greif's releasing it from any liability under the policy for further defense costs relating to those claims, which included plaintiffs'. R. Vol. 4, Doc. 98, Ex. D at 1-2. In October 1995, plaintiffs obtained judgment against Greif, and in December 1995, filed this garnishment action against National Union.

The district court noted that in a garnishment action under Kansas law,[3] the judgment-creditor or garnishor "'takes the place and stands in the shoes of his debtor, taking only what the latter could enforce.'" Curiel v. Quinn, 832 P.2d 1206, 1209 (Kan. Ct. App. 1992) (quoting Harpster v. Reynolds, 524 P.2d 212, 215 (Kan. 1974)). In granting summary judgment in favor of National Union, the district court first stated that nothing in Kansas law prevented an insured under a directors and officers liability policy from releasing the insurer from liability. See Sapp, 961 F. Supp. at 246. It then held that through the FDIC settlement, Greif had released National Union from any liability under the policy prior to the time plaintiffs attempted to garnish the policy, and that because Greif no longer had any rights under the policy, plaintiffs could not have any. See id. at 246-47.

---

[3] The district court and parties have applied Kansas law throughout this case.

Alternatively, the court held that even if Greif had not released National Union, the insurer did not receive adequate timely notice of plaintiffs' claims under the claims made policy to trigger coverage for their claims. See id. at 247-48. Correspondingly, the court also denied plaintiff's motion for summary judgment.

We review the grant or denial of summary judgment de novo, applying the same standard used by the district court under Fed. R. Civ. P. 56(c).[4] See Wolf v. Prudential Ins. Co., 50 F.3d 793, 796 (10th Cir. 1995). When applying this standard, we view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. See id.

On appeal, plaintiffs contend that the district court erred in concluding that Greif's release of National Union barred their recovery under the policy because (1) the release is void because National Union obtained it through fraudulent misrepresentations; (2) the release could not affect their claims because they arose prior to the release and both Greif and National Union were aware of the claims before negotiating the release; (3) National Union paid other claims against the policy, including the settlement payment to Greif; and (4) the release applied only to the FDIC's claims and not to claims by the other parties to the FDIC

---

[4] While plaintiffs have indicated they are also appealing the district court's denial of their motion for reconsideration, they have not presented any argument regarding this issue on appeal. We therefore consider it waived. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990).

settlement. With respect to the notice issue, plaintiffs contend that the court erred in concluding there were no disputed facts regarding whether National Union had received timely notice of their claims and whether it had waived its right to timely notice. Because the district court ruling on the notice issue is sufficient to affirm its decision, we address only that issue.

The directors and officers liability policy that National Union issued is a "claims made" policy. Generally, under a claims made policy, coverage is triggered only when an insured notifies the insurer during the policy period of claims against the insured. See LaForge v. American Cas. Co., 37 F.3d 580, 583 (10th Cir. 1994) (noting difference between claims made and occurrence policies in what triggers coverage). The specific language of the policy in question, of course, circumscribes any general rules. See id. ("Under Kansas and general common law relating to the interpretation of insurance contracts, we are bound by clear and unambiguous language, construing the document as a whole."). Section 8 of the policy describes the notice and claim reporting requirements that must be met for coverage to be triggered. Paragraphs (a) and (b) of section 8 discuss coverage when notice of actual claims is provided to the insurer during the policy period--the typical trigger of coverage under a claims made policy. Paragraph (c), however, expands coverage to include situations in which notice

only of "circumstances" that might lead to a claim is provided during the policy period. This paragraph states as follows:

> If during the Policy Period . . . the Company [Midland] or the Insureds [directors and officers] shall become aware of any circumstances which may reasonably be expected to give rise to a claim being made against the Insureds and shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a claim, with full particulars as to dates and persons involved, then any claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of, based upon or attributable to such circumstances or alleging any Wrongful Act[5] which is the same as or related to any Wrongful Act alleged or contained in such circumstances shall be considered made at the time such notice of such circumstances was given.

R. Vol. 3, Doc. 70, Ex. B at 4-5. Section 8(c) thus provides that the policy will cover claims made following the policy period if, during the policy period, the insurer was provided notice of the circumstances giving rise to the claim, including "full particulars" regarding the circumstances and the reasons for anticipating a claim.

Plaintiffs claim that adequate notice of their claim against Greif was provided by two letters. The first was sent by Midland president Monte Grissom to National Union on March 30, 1993, and notified National Union generally of

---

5    The policy defines "wrongful act" as "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by the Directors or Officers of the Company in their respective capacities as such, or any matter claimed against them solely by reason of their status as Directors or Officers of the Company." R. Vol. 3, Doc. 70, Ex. B at 2.

potential claims for "mismanagement of lending by the institution and for other activities which may constitute 'wrongful acts' as defined in the . . . policy." R. Vol. 3, Doc. 70, Ex. C. The second letter was sent to National Union by the FDIC on June 30, 1993, after it had taken over as receiver of Midland. This letter was intended to provide notice to National Union of claims the FDIC may have against former bank directors and officers with respect to loan transactions involving eleven entities or groups of borrowers. One group included Ronald Sapp, plaintiff Fletcher Sapp's brother, Ronald's wife Janet and Fletcher Sapp, and the letter refers to two loans made to the Sapps on February 7, 1991, the same day that Midland made the two loans to plaintiffs that were involved in their claim against Greif.

We agree with the district court that the letters, alone or combined, did not provide National Union with adequate notice under the policy to trigger coverage. The Grissom letter is clearly too general and vague to provide notice under section 8(c). See FDIC v. Barham, 995 F.2d 600, 605 (5th Cir. 1993) (notice of "general bad practices" insufficient to trigger coverage under claims made policy requiring notice of "facts and circumstances . . . having the potential to give rise to a claim"). While the FDIC letter is more specific, plaintiffs' claims against Greif cannot be construed as "alleging, arising out of, based upon or attributable

to" the circumstances or wrongful acts reported in that letter, as required by section 8(c) of the policy.

The February 7, 1991 transaction involving the Sapps was comprised of four separate loans covered under one agreement. Loan 1 was to plaintiffs for $2 million; loan 2 was to Ronald and Janet for $9.4 million; loan 3 was to plaintiffs for $2.4 million; and loan 4 was to plaintiffs for $1.65 million. In their state court action against Greif, plaintiffs contended that

> [o]n or about April 12, 1991, defendant Greif caused plaintiffs to satisfy the conditions of loan number 4 by having plaintiffs deed to the bank the various properties called for therein in lieu of making the payments called for on said loan. Unknown to plaintiffs was the fact that substantial monies had been taken from loan number 1 and used to pay down loan number 4 prior to April 12, 1991. These acts on the part of Midland Bank were orchestrated, directed and controlled by defendant Greif . . . .

R. Vol. 2, Doc. 17 (certified copy of state court file), Amended Pretrial Order at 2. The FDIC letter refers only to loans 2 and 3, although it misidentifies loan 3 as being made to Ronald and Janet. The letter does not mention loans 1 and 4, the only loans involved in plaintiffs' claims against Greif. The circumstances described in the letter that could lead to a claim--insufficient collateral supporting and inadequate cash flow servicing the loans, see R. Vol. 3, Doc. 70, Ex. D at 6-- and the FDIC letter's general description of the "wrongful acts"[6] that might give

---

[6] The FDIC letter listed the following wrongful acts:

(continued...)

-10-

rise to a claim did not include anything like misapplication of funds, which is essentially the basis of plaintiffs' claims against Greif. The letter identifies a bank loan officer, Bruce Rhoades, as being involved in the relevant loan transactions, but does not mention Greif, and it identifies claims that the FDIC might have, not the Sapps. And finally, the circumstances described that might give rise to a claim occurred sometime after July 15, 1992, well after the date of Greif's alleged actions.[7]

---

[6](...continued)

1)    Failure by the directors to exercise adequate supervision over the bank's officers and employees.

2)    Failure to establish and enforce adequate debtor repayment programs.

3)    Extending credit with an over-reliance on collateral, rather than cash flow.

4)    Extending credit to borrowers who were not creditworthy or were known to be in financial difficulty.

5)    Failure to employ sound internal controls.

6)    Failure to supervise, manage, conduct and direct the Banks' business and affairs to ensure compliance with law, the banks' by-laws, and prudent banking principles.

R. Vol. 3, Doc. 70, Ex. D at 6-7

[7]    Plaintiffs point to the FDIC letter's mention of a July 1992 restructuring of the loans, which they contend included loans 1 and 4, and argue that this restructuring "was the **final link** in the process that caused the Plaintiffs' loss." Appellants' Br. at 20. However, it is clear from both the amended pretrial order

(continued...)

-11-

As the district court correctly found, "plaintiffs have not produced any evidence linking the conduct mentioned in the FDIC Letter to the conduct on which their [state court] lawsuit and judgment are based." Sapp, 961 F. Supp. at 248. The only possibly relevant "circumstance" reported in the FDIC letter is the general relationship among the four loans to the Sapps. Neither this general relationship nor the general description of Midland's bad acts is sufficient to constitute notice to National Union of circumstances that might lead to plaintiff's claims. Similarly, plaintiffs' claims cannot reasonably be viewed as being based on or attributable to other circumstances that were reported. National Union thus did not receive notice of their claims sufficient to trigger coverage under the policy.

Alternatively, citing North River Ins. Co. v. Huff, 628 F. Supp. 1129 (D. Kan. 1985), and Henry v. Johnson, 381 P.2d 538 (Kan. 1963), plaintiffs argue that National Union waived its right to timely notice because it failed to reserve its right to disclaim liability or deny coverage due to lack of timely notice when notified of their claims against Greif and when it paid Greif's defense costs related to their claim.[8] National Union contends that prior to receiving notice of

_____

[7](...continued)
and Fletcher Sapp's testimony in the state court that Greif's wrongful acts and their loss occurred no later than April 12, 1991.

[8]     The district court did not address this issue in its decision granting

(continued...)

-12-

plaintiffs' claims against Greif, it had sent letters to Midland in January 1993 and to Greif in June 1993 reserving all rights and that these letters sufficed to reserve all of its rights regarding plaintiffs' claims against Greif. It also apparently contends that because the policy excluded any duty to defend, its settlement with Greif cannot be construed as an assumption of his defense, and therefore the waiver rule does not apply.

Under Kansas law, when an insurer has undertaken a defense under a liability policy, a reservation of rights regarding defenses to coverage is ineffective "unless it makes specific reference to the policy defense being relied upon by the insurer." North River, 628 F. Supp. at 1134; see also Bogle v. Conway, 433 P.2d 407, 411-13 (Kan. 1967); Henry, 381 P.2d at 544-45. Under this rule, National Union's general reservation of rights would not be sufficient to reserve the lack of timely notice issue if it were required to have done so.[9] In this

---

[8](...continued)
summary judgment, but we disagree with National Union that plaintiffs failed to raise it in the district court. See R. Vol. 5, Doc. 94 at 21 (Plaintiffs' opposition to National Union's motion for summary judgment).

[9]      National Union's January 1993 letter to Midland addressed notice of claims against two other Midland officers, and stated that it "reserve[s] all of our respective rights concerning this matter pursuant to the terms and conditions of the policy." R. Vol. 5, Doc. 97, Ex. M. Its June 1993 letter regarding potential claims against Greif stated that because of possible misrepresentations in the policy application, it "reserves all rights, including the right to seek rescission of the Policy." Id., Ex. Q at 1. In neither letter did National Union expressly reserve its rights on the basis of untimely notice.

-13-

situation, however, we do not believe National Union was required to specifically reserve the right to deny coverage for lack of timely notice.

The cases on which plaintiffs rely, which speak in terms of both waiver and estoppel, contemplate a situation in which the insurer has an obligation to defend the insured. Thus, the rule requiring the insurer to specify what rights it is reserving allows the insured to "make an intelligent decision whether to consent to the assumption of his defense and the control of his lawsuit by the carrier, or to take another course." Associated Wholesale Grocers, Inc. v. Americold Corp., 934 P.2d 65, 84 (Kan. 1997) (quoting Bogle, 433 P.2d at 412); see also Golf Course Sup't Ass'n v. Underwriters at Lloyd's, 761 F. Supp. 1485, 1492 (D. Kan. 1991) ("[T]he rule prevents an insurance company from taking over the defense of a matter but avoiding the coverage at the end result, without an adequate reservation and warning to the insured. That way, the insured can make its own decision regarding the need for independent defense counsel."). The policy here, as National Union points out, did not contain a defense obligation, and there is no evidence that National Union controlled Greif's defense. Thus, the rule does not appear to be applicable here. See id. at 1493 (collecting cases indicating that waiver or estoppel due to inadequate reservation of rights does not apply where insurer does not control defense).

Additionally, under Kansas law, "waiver cannot be used to expand the coverage of an insurance contract; it applies only to forestall the forfeiture of a contract." Hennes Erecting Co. v. National Union Fire Ins. Co., 813 F.2d 1074, 1078 (10th Cir. 1987); see also Western Food Prods. Co. v. United States Fire Ins. Co., 699 P.2d 579, 584 (Kan. Ct. App. 1985). "In a 'claims made' policy, the notice is the event that invokes coverage under the policy." Laforge, 37 F.3d at 583. Applying the waiver doctrine to late notice would go beyond merely extinguishing a defense to underlying coverage and would improperly extend coverage beyond the period for which the policy provides. See id. ("Clear notice of a claim . . . during the policy period [of a claims made policy] is crucial, because allowing actual notice beyond the policy period would constitute[] an unbargained-for expansion of coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy.") (internal quotation omitted); see also Calocerinos & Spina Consulting Eng'rs., P.C. v. Prudential Reins. Co., 856 F. Supp. 775, 780 (W.D.N.Y. 1994). Thus, National Union's failure to expressly assert the lack of timely notice in its reservations of rights cannot operate as a waiver of its right to receive timely notice to trigger coverage under the policy.

Plaintiffs also appear to argue that it was unfair or collusive of National Union to pay Greif's defense costs for their claims, but to deny coverage of the

-15-

claims themselves, and that National Union should be estopped from doing so. At the time of the Greif settlement, plaintiffs may have had rights equal to Greif's under the policy,whatever those rights may have been.[10] National Union settled

---

[10] It is partly for this reason that we are not affirming the district court on the alternate ground that Greif released National Union from all obligations to him through the FDIC settlement. The district court held that because Greif was not legally required to maintain directors and officers liability insurance, he was free to release National Union from its obligations at any time. However, "[i]t has been held numerous times that the rights of the injured party in a liability insurance policy applicable to an accident arise immediately upon the happening of the accident, and cannot be destroyed by an attempted subsequent cancellation, release, or compromise by the insured and insurer." Cowley v. Texas Snubbing Control, Inc., 812 F. Supp. 1437, 1452 (S.D. Miss. 1992) (collecting cases; internal quotation omitted), aff'd, 15 F.3d 180 (5th Cir. 1994); see also 8B J. Appleman, Insurance Law and Practice § 5020 (1981) ("[I]t is the general rule that an injured person's rights cannot be defeated by a cancellation or a settlement after an accident has occurred."). Kansas courts have apparently not had the opportunity to address this precise issue yet. However, they have adopted the related rule precluding an insurer from rescinding, after an accident has occurred, a compulsory automobile liability policy and denying coverage to an innocent injured party even where the insured fraudulently obtained the policy. See Continental W. Ins. Co. v. Clay, 811 P.2d 1202, 1207 (Kan. 1991).

Transporting the general rule from an accident or occurrence policy to a claims made policy, it would appear that if an insurer receives proper notice of a claim within the policy period, the injured party's rights have arisen, and the insurer and insured cannot agree to cancel any coverage the policy might provide. Thus, had National Union received timely notice here, the FDIC settlement may not have been effective to release National Union from its obligations under the policy. Although there is authority indicating that an insurer may rescind a noncompulsory insurance policy, such as this one, because it was procured through fraud by the insured, see, e.g., Wright v. Newman, 598 F. Supp. 1178, 1192 (W.D. Mo. 1984), aff'd, 767 F.2d 460 (8th Cir. 1985), National Union did not rescind the policy under the FDIC settlement. Additionally, plaintiffs have presented more than a colorable claim that National Union could not have

(continued...)

-16-

Greif's claim for defense costs without any admission of liability under the policy. While we are at a loss to understand why National Union paid Greif anything for his defense costs after he had released National Union from any policy obligations in the FDIC settlement, we cannot see how this payment creates any rights in plaintiffs or precludes National Union from denying coverage. Similar to its treatment of waiver, Kansas law does not recognize expansion of coverage through estoppel. See, e.g., Western Food Prods., 699 P.2d at 584. Further, even if it did in theory, estoppel would not apply here because it requires detrimental reliance, see Federal Kemper Life Assur. Co. v. Ellis, 28 F.3d 1033, 1041 (10th Cir. 1994), and plaintiffs have not contended that National Union ever led them to believe the policy covered their claims or that they were prejudiced by its actions. See Calocerinos, 856 F. Supp. at 780-81 (finding insurer's apparent mistaken provision of coverage for two insureds for claim not covered by policy did not bar denial of coverage to other insureds for similar claims, where latter insureds could not show reliance on or prejudice from insurer's actions).

---

[10](...continued)
rescinded the policy.

Because we are affirming on the lack of timely notice, we need not address whether the district court was correct in granting summary judgment on the basis of the release.

In sum, we conclude that National Union did not receive notice of plaintiffs' claims sufficient to trigger coverage under the policy. We therefore affirm the district court's grant of summary judgment to National Union, and correspondingly, its denial of summary judgment to plaintiffs.[11]

AFFIRMED.

Entered for the Court

James E. Barrett
Senior Circuit Judge

---

[11] Plaintiffs also contend that the district court erred in denying their motion for sanctions against National Union and to strike a portion of its pleadings. Plaintiffs contend that a variety of statements National Union made in its pleadings regarding Midland's allegedly fraudulent application for insurance and its knowledge of the fraudulent application were themselves false and fraudulent. These same allegations form the basis of plaintiffs' claim that National Union could not rescind the policy. The district court denied the motion on the basis that on the record before it, the statements were objectively reasonable. Whether National Union's statements were false was a disputed issue of fact not relevant to the district court's analysis, nor to the basis for our affirmance, and the court did not abuse its discretion in not prolonging the litigation by trying to resolve the matter.