Edward D. OSOSKI, d/b/a Federal Oil Company, Plaintiff,

v.

ST. PAUL SURPLUS LINES INSURANCE COMPANY, Defendant.

No. 00–CV–10026.

United States District Court, E.D. Michigan, Northern Division.

Sept. 10, 2001.

*OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR REHEARING*

LAWSON, District Judge.

In an opinion filed on August 6, 2001, this Court held that the failure of a bearing in a traveling block which was part of a block-and-tackle assembly did not constitute a "collapse" of the structure to which it was attached, and therefore was not an event within the scope of coverage of an

insurance policy which provided payment for damage incurred during oil drilling operations "caused by ... [the] collapse of a derrick or mast...." The plaintiff has now filed a motion in which he asks the Court to rehear the matter, claiming that the Court committed palpable error in failing to accept plaintiff's definition of "collapse." The plaintiff claims that "collapse" can be defined in an expansive way to include the failure of a component part attached to a structure—in this case, the "mast" of the drilling rig—and therefore concludes that an ambiguity exists in the insurance policy which precludes summary judgment for the defendant. This Court was misled, the plaintiff suggests, by its reliance on the *Oxford English Dictionary* as an authoritative source of the meaning of words in the English language, and that resort to more colloquial sources will illuminate a brighter path to enlightenment. The Court acknowledges, as it already had in its original opinion, that the term "collapse" has several definitions. However, to use that term to describe the events in this case would amount to a distortion of language leading to a forced and strained construction of the insurance contract. The motion, therefore, for rehearing will be denied.

## I.

 Since this Court filed its opinion on August 6, 2001, the Court of Appeals for the Sixth Circuit decided *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581 (6th Cir.2001), in which the Court held

that ambiguity in a contract precludes summary judgment. Like this Court, the court of appeals cited Michigan decisional authority which states that ambiguity occurs when contract language "is susceptible to two or more reasonable interpretations." *Id.* at 585 (citation omitted). In order to discern the meaning of undefined terms in a contract, courts may resort to several sources for the meaning of the language used by the parties, including the plain language of the contract, relevant dictionary definitions, decisional law previously interpreting the term, industry standards and practices, and the parties' conduct to the extent it reflects their own understanding of the disputed term. *Id.* at 586.

## II.

In the motion for rehearing, the only source of the meaning of "collapse" upon which the plaintiff relies is the dictionary, or, more precisely, several dictionaries. He has not identified any relevant case law, industry practices or the parties' conduct to suggest that "collapse" can encompass the simple failure of a bearing in a pulley. The cases cited by the Court in its original opinion, however, reinforce the notion that the sense of the term "collapse" when applied to a structure—such as a derrick or mast—denotes the compromise of the physical properties of the structure including shape, size or strength. *See Indiana Ins. Co. v. Liaskos*, 297 Ill.App.3d 569, 231 Ill.Dec. 844, 697 N.E.2d 398, 402–06 (1998), and cases collected therein.[1]

---

1. After he filed his motion, the plaintiff has sent the Court a letter with "another authority on point" consisting of an unpublished Michigan Court of Appeals decision, *Pioneer State Mut. Ins. Co. v. Splan*, No. 220477 (Mich.Ct. App. Aug. 24, 2001). Although an unpublished decision of a state's intermediate appellate court is not an authoritative source of state law, *see* Mich. Ct. R. 7.215(C)(1)(unpub-

lished decisions are not binding precedent); *King v. Order of United Commercial Travelers of Am.*, 333 U.S. 153, 161, 68 S.Ct. 488, 92 L.Ed. 608 (1948)(federal courts are not bound by a state court decision which is not binding on the state court), the case does confirm that court's understanding of the term "collapse," which is quite similar to the consensus of decisions summarized by the Illinois Court of

The main thrust of the plaintiff's argument is that the resort by this Court to a single dictionary for the definition of a disputed term is erroneous, and that other dictionaries may furnish secondary or tertiary definitions of "collapse" that are more consistent with what happened in this case. The plaintiff is particularly critical of this Court's choice of dictionaries, contending that using the *Oxford English Dictionary* as an authoritative source of English language usage is "an exercise fraught with abecedarian peril." Pl.'s Br. in Supp. of Mot. for Reh'g at 8 n. 3.[2]

The plaintiff directs the Court to *Webster's Deluxe Unabridged Dictionary* and *Merriam Webster's Collegiate Dictionary,* both of which include among the definitions of "collapse" the notion of "breakdown." Indeed, *New Webster's Dictionary of the English Language* at 197 (Deluxe Encyclopedic ed.1981) defines "collapse" as:

> A falling in or together, as of the sides of a hollow vessel; a more or less sudden failure of the vital powers; a sudden and complete failure of any kind; a breakdown.

The *Webster's II New College Dictionary* (Houghton Mifflin Co.2001) contains the following definition:

> *vi.* **1.** to fall down or inward suddenly; cave-in. **2.** to break down suddenly in strength or health and cease to function

Appeals in *Indiana Ins. Co.* The *Splan* Court held that the term "include[s] any substantial impairment of the *structural integrity* of the covered home." Slip op. at 3 (emphasis added). This holding is consistent with this Court's holding in the original opinion, and supports a finding that the failure of the traveling block in this case did not constitute a "collapse" in any reasonable sense of that term.

**2.** Plaintiff, perhaps, could derive some comfort from a more careful reading of the original opinion in which he will find that the lexicographical source cited in the opinion was the 1989 (second) edition of the *Oxford English Dictionary*, not the 1933 edition as he suggests in his brief. Nor does the Court accept plaintiff's assumption (without authoritative reference) that the *Oxford English Dictionary* reflects only British usage of the English language. Rather, according to the editors, the dictionary is a compilation

> in alphabetical series [of] the words that have formed the English vocabulary from the time of the earliest records down to the present day, with all the relevant facts concerning their form, sense-history, pronunciation, and etymology. It embraces not only the standard language of literature and conversation, whether current at the moment, or obsolete, or archaic, but also the main technical vocabulary, and a large measure of dialectal usage and slang. Its basis is a collection of several millions of excerpts from literature of every period amassed by an army of readers and the editorial staff. Such a collection of evidence—it is represented by a selection of about 2,400,000 quotations actually printed—could form the only possible foundation for the historical treatment of every word and idiom which is the *raison d'être* of the work. It is generally recognized that the consistent pursuit of this method has worked a revolution in the art of lexicography. In 1891 a great English philologist wrote of the 'debt' which 'English grammar will some day owe to the *New English Dictionary*'; and the debt has been mounting up ever since. There is no aspect of English linguistic history that the Dictionary has not illuminated; its findings have called for the revision of many philological statements and the reconsideration of many judgments on textual matters. So wide is its scope and so intensive its treatment that it has served for students, both native and foreign, as a lexicon of many languages, and, though it deals primarily with words, it is virtually an encyclopaedic treasury of information about things. It has provided a ready quarry of material for many authors of treatises and dissertations.

*Oxford English Dictionary*, Preface to the Second Edition (1989). Accordingly, the Court concludes that the *Oxford English Dictionary* can serve as an authoritative source of historical *and* contemporary English language usage.

[a government that *collapsed* ][a patient who *collapsed* ] **3.** to fold compactly [temporary fencing that *collapses* ] ... *n* **1.** the act of falling down or inward, as from loss of supports. **2.** an abrupt failure of function, strength, or health: breakdown.

The plaintiff then looks to the definition of "breakdown" and discovers that it includes "a failure to function." The plaintiff then reasons that because the bearing in the traveling block "failed to function," it must have "collapsed" and, therefore, if the peril did not fall four-square within the Policy, at least an ambiguity exists which should preclude summary judgment for the defendant.

■ The Court finds that the logic of the plaintiff's argument is diaphanous and brittle; it simply does not support the argument. First, the secondary and tertiary dictionary definitions of terms are not chains of synonyms. Rather, they are intended to expand, not distort, the sense of the defined term. Thus, a "collapse" can indeed be thought of an a type of "breakdown." But not all breakdowns are properly termed a "collapse." Similarly, a tornado is a storm but not all storms are tornados; a locomotive is a vehicle but not all vehicles are locomotives. Thus, an insurance policy that protects locomotives destroyed by tornados would not cover automobiles damaged by a hail storm, although one could extract some ambiguity in that analysis employing the logic used by the plaintiff in this case.

Second, the exercise of linking definitions as one trips through the pages of the dictionary is interesting but neither useful nor illuminating. For example, an alternative definition of "breakdown" is "decomposition." *Webster's New World Dictionary, Modern Desk Edition* at 58 (The World Publishing Co.1971). But no serious student of language, nor an ordinary judge, lawyer or citizen, would argue that decomposition and collapse have the same or similar meanings. One could, perhaps, collapse in a grave, but not after one's burial.

■ Finally, the plaintiff contends once more that all this confusion is the fault of the insurance company which chose to draft the language of the Policy without defining the term. Under the rule of *contra proferentem,* plaintiff claims that the Court must accept his conjured definition of the disputed term. This argument as framed by the plaintiff, however, sacrifices not only fidelity to the language but the rule of reason as well. It is not reasonable to expect that every word in an insurance contract will be internally defined. Some terms, when given their common and generally understood meaning, will require some interpretative gloss. As the Supreme Court noted when examining statutory language, "[t]here is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms would be a nice question, [but] because we are condemned to the use of words, we can never expect mathematical certainty from our language." *Hill v. Colorado,* 530 U.S. 703, 733, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000)(internal quotes and citations omitted). That is why ambiguity exists only when a term is susceptible to two or more *reasonable* interpretations. *City of Wyandotte,* 262 F.3d 581 at 584–85.

However, just because a skillful advocate is able to concoct an argument that pulls an event within a conceivable description does not mean that a term is ambiguous in the legal sense. "Ever since Macbeth mistakenly relied on the linguistic precision of the witches' prophecy, people have been able to construct weird and fanciful instances in which even the clearest language breaks down." *Glen Coal Co. v. Seals,* 147 F.3d 502, 515 (6th Cir.

1998)(Boggs, J., concurring) (quoting Frederick Schauer, *Easy Cases,* 587 Cal. L.Rev. 399, 420 (1985)).

### III.

In this case, it bears repeating that the term "collapse" has several meanings. *See e.g., Indiana Ins. Co., supra.* However, a missing, worn or defective bearing causing the failure of a pulley of a traveling block is not an event which can be reasonably included in any of the definitions of that term. Because there was no collapse of a derrick or mast in this case, there is no coverage.

■ Since the motion before the Court is one seeking rehearing, it is governed by E.D. Mich. LR 7.1(g)(1), which requires the moving party to show (1) a "palpable defect," (2) the defect misled the court and the parties, and (3) that correcting the defect will result in a different disposition of the case. E.D. Mich. LR 7.1(g)(3). A "palpable defect" is a defect which is obvious, clear, unmistakable, manifest, or plain. *Marketing Displays, Inc. v. Traffix Devices, Inc.,* 971 F.Supp. 262, 278 (E.D.Mich.1997)(citing Webster's New World Dictionary 974 (3d Ed.1988)). Further, the Local Rules also provide that any "motions for rehearing or reconsideration which merely present the same issues ruled upon by the Court, either expressly or by reasonable implication, shall not be granted." E.D. Mich. LR 7.1(g)(3).

The plaintiff has demonstrated neither a palpable defect in this Court's previous opinion, nor any reason why there should be a different disposition of this case. Accordingly, it is **ORDERED** that the plaintiff's motion for rehearing [dkt # 43] is **DENIED.**