SIGMA FINANCIAL CORPORATION,
Plaintiff,

v.

AMERICAN INTERNATIONAL SPE-
CIALTY LINES INSURANCE CO.,
Prosurance Insurance Group, Rich
Glenn and Associates, Inc. and Rich
Glenn, Jr., Defendants.

No. 01–CV–70624–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 4, 2002.

Barry Feldman, Birmingham, MI, for plaintiff.

Harvey Heller, Southfield, MI, Timothy Mizerowski, Farmington Hills, MI, Larry Davidson, Troy, MI, for defendant.

**OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY'S MOTION FOR RECONSIDERATION AND (2) DENYING DEFENDANT'S MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL**

BORMAN, District Judge.

Now before the Court is Defendant American International Speciality Lines Insurance Company's motion for reconsideration, and alternatively, its motion for certification of interlocutory appeal. Having considered the entire record, and for the reasons that follow, the Court GRANTS IN PART and DENIES IN PART Defendant's motion for reconsideration and DENIES Defendant's motion for permission to immediately appeal the Court's Order.

### FACTS [1]

■ Plaintiff Sigma Financial Corporation (Plaintiff or Sigma) initially purchased a claims made errors and omissions policy of liability insurance from American International Specialty Lines Insurance Co. (AIG or Defendant) in 1993.[2] The policy was renewed annually, and it is undisputed that Plaintiff paid all necessary premiums. The policy (and its subsequent renewals) required AIG

[t]o pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages resulting from any claim or claims first made against the Insured and reported in writing to the Company during the Policy Period for any Wrongful Act of the Insured or of any other person for whose actions the Insured is legally responsible, but only if such Wrongful Act occurs on or after the Retroactive Date and prior to the end of the Policy Period and solely in rendering or failing to render Professional Services by or on behalf of the securities broker/dealer named in Item 1 of the Declarations to a client of such securities broker/dealer.

Policy No. 244–27–09, Pl. Exh. A, p. 1 and Policy No. 278–15–39, Pl. Exh. B, p. 1. The 1998–99 and 1999–2000 policies each had limits of $1,000,000 ($1 million) for "Each Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts," and an aggregate limit of $9,000,000 ($9 million). Policy No. 244–27–09 Pl. Exh. A and Policy No. 278–15–39, Pl. Exh. B. These policies also included an exclusion which stated:

This policy does not apply . . .

j) to any claim arising out of the facts alleged, or arising out of the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or in any occurrence of which notice has been given, under

---

1. The following recitation of the facts is drawn, in part, from the Court's October 29, 2001 Opinion and Order granting Plaintiff's motion for partial summary judgment.

2. According to the Michigan Supreme Court, "a 'discovery' or 'claims made' policy is one in which indemnity is provided no matter when the alleged error or omission or act of negligence occurred, provided the misdeed complained of is discovered and the claim for indemnity is *made* against the insurer during the policy period." *Stine v. Continental Casu-*

*alty Co.,* 419 Mich. 89, 97, 349 N.W.2d 127 (1984) (emphasis in original). It should be noted, however, that the policies at issue are not true "claims made" policies since in the Special Reporting Clause they "provided coverage for claims after the policy period arising out of 'occurrences' sufficiently noticed during the policy period." *FDIC v. Interdonato,* 988 F.Supp. 1, 3 (D.D.C.1997). "A true claims made policy would only cover claims brought and sufficiently noticed during the coverage period." *Id.* at 2 n. 2.

any policy of which this policy is a renewal or replacement or which it may succeed in time . . . .

Policy No. 244–27–09, Pl. Exh. A, p. 4 and Policy No. 278–15–39, Pl. Exh. B, p. 3. Additionally, the policies had a limit of liability which stated:

The limit of liability stated in the Declarations as applicable to "Each Wrongful Act or series of continuous, repeated, or interrelated Wrongful Acts" is the limit of the Company's liability for all amounts payable hereunder in settlement or satisfaction of claims, judgements or awards and Defense Costs arising out of the same Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts, without regard to the number of Insureds, claims, demands, suits or proceedings or claimants. If additional claims are subsequently made which arise out of the same Wrongful Act or series of continuous, repeated or interrelated Wrongful Acts as claims already made and reported to the Company, all such claims, whenever made, shall be considered first made within the Policy Period or the extended reporting period in which the earliest claim arising out of such Wrongful Act was first made and reported to the Company, and all such claims shall be subject to one such limit of liability.

Policy No. 244–27–09, Pl. Exh. A, p. 5 and Policy No. 278–15–39, Pl. Exh. B, p. 5.

Plaintiff bought its policies through Defendant Rich Glenn and Associates, Inc. Plaintiff alleges that Defendant Rich Glenn conducted the negotiations regarding the recruitment of Sigma as a client. At some point, Rich Glenn and Associates was purchased by Prosurance Insurance Group.[3]

Sigma sold various investment opportunities to the public, including Mortgage Company of America (MCA) products. In January of 1999, MCA failed, under circumstances involving allegations of fraud. This failure of MCA resulted in legal claims against Sigma by its customers who had purchased, *inter alia*, various MCA products from Sigma representatives. Sigma sent AIG a letter on February 24, 1999, putting AIG on notice of possible legal claims against Sigma based on the failure of MCA. AIG responded to this letter by sending Plaintiff a reservation of rights letter.

It is undisputed that individual claims were filed against Sigma and its registered representatives in both 1999 and 2000, the coverage years of the policies at issue. AIG has paid some of the settlements and expenses which resulted from these lawsuits. However, AIG refuses to pay more than the $1 million wrongful act limit included in the 1999 policy, and refuses to pay any sum under the 2000 policy.

The Court, on October 29, 2001, granted Plaintiff's Motion for Partial Summary Judgment, holding that "the lawsuits brought against Sigma by its customers, based on the failure of MCA, as to which Sigma initiated notice to Defendant, do not constitute the same wrongful act, nor are they part of a series of continuous, repeated, or interrelated wrongful acts." Oct. 29, 2001 Order at 15. The Court noted that:

Each sale of MCA product involved different Sigma representatives, different MCA products, and different purchasers. This is not comparable to Sigma selling uniform shares of X Company

---

**3.** An extensive discussion of the relationships between these parties is not included because Plaintiff brings this motion against Defendant AIG solely. Counsel for Prosurance Insurance Group, Rich Glenn and Associates, Inc. and Rich Glenn, Jr. were present at the hearing on August 22, 2001. Counsel for Rich Glenn and Associates, Inc. and Rich Glenn, Jr. indicated that those defendants concurred in the relief sought by Plaintiff Sigma.

stock. The Court concludes that the sales of MCA product cannot be considered "continuous, repeated or interrelated Wrongful Acts."

*Id.* Additionally, the Court held that Plaintiff could recover under both the 1998–99 and the 1999–2000 policies—claims arising in 1998–1999 apply against that year's policy, and claims arising in 1999–2000 apply against that year's policy. *Id.* at 16, 19.

Defendant AIG, now seeks reconsideration of this decision. Alternatively, should the Court deny the motion for reconsideration, Defendant seeks certification to appeal pursuant to 28 U.S.C. § 1292(b), allowing Defendant to immediately appeal the Court's interpretation of the contract.

## ANALYSIS

### I. Defendant's Motion for Reconsideration

#### A. Standard of Review

■ Eastern District of Michigan Local Rule 7.1(g)(3) provides that in order for a court to grant a motion for reconsideration, the movant must show (1) a palpable defect; (2) that misled the court and the parties; and (3) that correcting the defect will result in a different disposition of the case. E.D. MICH. L.R. 7.1(g)(3); *Ososki v. St. Paul Surplus Lines Ins. Co.*, 162 F.Supp.2d 714, 718 (E.D.Mich.2001). "A 'palpable defect' is a defect which is obvious, clear, unmistakable, manifest, or plain." *Ososki*, 162 F.Supp.2d at 718 (citation omitted). Moreover, "[g]enerally, ...

the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication." E.D. MICH. L.R. 7.1(g)(3).

### B. Continuous, Repeated or Interrelated Wrongful Acts

■ Defendant argues that the Court's analysis regarding whether the lawsuits brought against Sigma were based on "continuous, repeated or interrelated Wrongful Acts" was incomplete.[4] Defendant contends that the Court only addressed whether the sales were "interrelated," and thus failed to address whether the sales were "continuous or repeated." However, the Court clearly held that the "sales of MCA product cannot be considered 'continuous, repeated, or interrelated Wrongful Acts.'" Oct. 29, 2001 Order at 15. The Court finds no palpable defect as required by Local Rule 7.1(g)(3), and thus denies Defendant's motion for reconsideration as to this issue.

### C. Applicable Policy Years

As noted in the Court's October 29, 2001 Order, Defendant argues that because notice of potential MCA lawsuits was made during the 1998–99 policy year, only that policy year applies to the individual claims. Plaintiff claims, however, that since notice of several actual claims was given to AIG during the 1998–99 policy year, and notice of additional actual claims was given dur-

---

**4.** Defendant also argues that the Court was confused when it stated that the "lawsuits brought against Sigma ... do not constitute the same wrongful act, nor are they part of a series of continuous, repeated, or interrelated wrongful acts." Def.'s Br. at 5. Defendant thus asserts that the Court deemed the "lawsuits" to be the "Wrongful Acts" at issue, instead of the individual sales of MCA product. *Id.* Defendant, however, misconstrues the Court's opinion. Immediately after the above quoted language, the Court stated:

> Each sale of MCA product involved different Sigma representatives, different MCA products, and different purchasers. This is not comparable to Sigma selling uniform shares of X Company stock. The Court concludes that the sales of MCA product cannot be considered "continuous, repeated or interrelated Wrongful Acts."

Oct. 29, 2001 Order at 15. Thus, the Court clearly held that the individual "sales of MCA product" were not continuous, repeated or interrelated.

ing the 1999–2000 policy year, both policies apply to create a maximum exposure claim limit of $18 million. Upon reconsideration, the Court concludes that notice under the terms of the policy was given to AIG during the 1998–99 policy year, and therefore, pursuant to the Special Reporting Clause and Exclusion "j", the $9 million aggregate limit specified in the 1998–99 policy applies to all of Plaintiff's claims.

The policy at issue in this case is a "claims made" errors and omissions policy. The Court must construe this policy in a manner which is consistent with the purpose of a "claims made" insurance policy, preserving its primary benefit to both the insurer and the insured. *Pantropic Power Prods., Inc. v. Fireman's Fund Ins. Co.,* 141 F.Supp.2d 1366, 1369 (S.D.Fla.2001) (citing *City of Harrisburg v. International Surplus Lines, Ins. Co.,* 596 F.Supp. 954, 961 (M.D.Pa.1984)); *Upper Allen Township v. Scottsdale Ins. Co.,* No. 921557, 1994 WL 772759, at *5 (M.D.Pa.1994) (unpublished opinion).

■ Coverage under a "claims made" policy is available for wrongful acts occurring prior to the policy period, as long as the potential claim was discovered and noticed during the period. Claims made policies differ from traditional occurrence policies:

> In the "occurrence" policy, the peril insured is the "occurrence" itself. Once the occurrence takes place, coverage attaches even though the claim may not be made for some time thereafter. While in the "claims made" policy, it is the making of the claim which is the event and peril being insured and, subject to policy language, regardless of when the occurrence took place.

**5.** Claims made policies can provide coverage for "potential claims" if, as in this case, the policy indicates that coverage is provided for

*American Cas. Co. of Reading, Pennsylvania v. Continisio,* 17 F.3d 62, 68 (3d Cir. 1994) (quoting *Zuckerman v. National Union Fire Ins. Co.,* 100 N.J. 304, 495 A.2d 395, 398 (1985)). Thus, a claims made policy, as its name suggests, covers claims (or occurrences which reasonably may give rise to a claim [5]) discovered by the insured during the policy period, assuming sufficient notice is given to the insurer. *Pantropic Power,* 141 F.Supp.2d at 1369; *FDIC v. Interdonato,* 988 F.Supp. 1, 3 (D.D.C.1997).

■ In fact, "in a 'claims made' policy, notice is a condition precedent to coverage." *Interdonato,* 988 F.Supp. at 3 n. 1.

> The notice provision of a claims-made policy is just as important to coverage as the requirement that the claim [or potential claim] be asserted during the policy period. If the insured does not give notice within the contractually required time period, in the instant case "during the policy period," there is simply no coverage under the policy.

*City of Harrisburg,* 596 F.Supp. at 961; *see also LaForge v. American Cas. Co.,* 37 F.3d 580, 583–84 (10th Cir.1994) (interpreting a nearly identical notice provision to require formal notification of potential claims to preserve coverage under claims-made policy).

The importance of notice to a "claims made" policy derives from the benefits achieved by both the insurer and the insured. The insurer is able to significantly decrease its exposure by limiting its liability to claims noticed in a fixed period of time. *United States v. Strip,* 868 F.2d 181, 187 (6th Cir.1989); *Continisio,* 17 F.3d at 68; *Pantropic Power,* 141 F.Supp.2d at 1369. Thus, because notice during the policy period is a prerequisite

claims arising out of an "occurrence" sufficiently noticed during the policy period. *Interdonato,* 988 F.Supp. at 3.

for coverage, a claims made policy benefits the insurer by allowing it to "close its books" on a policy at its expiration date, restricting its liability to a finite period of time, thus permitting " 'a level of predictability unattainable under standard occurrence policies.' " *Resolution Trust Corp. v. Ayo*, 31 F.3d 285, 289 (5th Cir.1994); *Upper Allen Township*, 1994 WL 772759 at *5 (noting that claims made policies "minimize the span of time between the insured event and the expiration of the insurer's liability to make payment for the event, and thus allow insurer's to 'close the books' on a policy at its expiration date"); *see also FDIC v. St. Paul Fire and Marine Ins. Co.*, 993 F.2d 155, 158 (8th Cir. 1993). In return for this limited exposure, the insured benefits from lower insurance premiums and retroactive coverage for wrongful acts which occur prior to the policy period. *Continisio*, 17 F.3d at 68 (less-expensive); *Interdonato*, 988 F.Supp. at 3 n. 1 (lower premiums); *Upper Allen Township*, 1994 WL 772759 at *5 (lower cost to insured and retroactive coverage).

Consequently, the notice provision of a "claims made" insurance policy is essential to coverage, effectively defining coverage and the insurer's exposure in a particular policy year. *Continisio*, 17 F.3d at 68–69; *see also St. Paul Fire*, 993 F.2d at 158 (noting that "the notice provision requirement sets the parameters of the coverage under the policy").

Here, the notice provisions of the policy are contained in paragraphs three and four of the "Special Provisions" section of the contract. Like many "claims made" policies, the contract provides, in relevant part:

### 3. LOSS PROVISIONS

The insured shall, as a condition precedent to the availability of the rights provided under this policy, give written notice to the Company as soon as practicable during the Policy Period, ... of any claim made against the Insured....

### 4. SPECIAL REPORTING CLAUSE

If during the Policy Period or during the extended reporting period, if the right is exercised by the Insured in accordance with Special Provision 5, the Insured shall become aware of any occurrence which may reasonably be expected to give rise to a claim against the Insured for a Wrongful Act which occurs on or after the Retroactive Date and prior to the end of the Policy Period, and provided the Insured gives written notice to the Company during the Policy Period or the extended reporting period, if applicable, of the nature of the occurrence and specifics of the possible Wrongful Act, any claim which is subsequently made against the Insured arising out of such Wrongful Act shall be treated as a claim made during the Policy Period....

Def.'s Br. Exh.'s A, B. Thus, the policy provides that if Sigma, during the policy period, becomes "aware of *any occurrence* which may reasonably be expected to give rise to a claim against the Insured for a Wrongful Act," and provided that Sigma gives written notice to AIG of the "nature of the occurrence and specifics of the possible Wrongful Act, any claim which is subsequently made against [Sigma] arising out of such Wrongful Act shall be treated as a claim made during the Policy Period." *Id.* (emphasis added).

The United States District Court for the District of Columbia analyzed nearly identical language contained in a "claims made" errors and omissions policy. *FDIC v. Interdonato*, 988 F.Supp. 1, 3 (D.D.C. 1997). The policy in *Interdonato* addressed potential claims in which the policyholders "shall become aware of any occurrence that may subsequently give rise

to a claim against any of them for a Wrongful Act . . ." *Id.*

■ Like *Interdonato*, the unambiguous language of the policy clearly indicates that the notice clause refers to situations where Sigma becomes aware of an "occurrence" which may reasonably give rise to a claim for a Wrongful Act—the insured need not give notice of a Wrongful Act, only an occurrence which may reasonably be expected to give rise to a claim for a Wrongful Act.[6] *Interdonato*, 988 F.Supp. at 6; *see also South Macomb Disposal Auth. v. American Ins. Co.*, 225 Mich.App. 635, 653, 572 N.W.2d 686 (1997) ("Clear and unambiguous language may not be rewritten under the guise of interpretation; contract terms must be enforced as written, and unambiguous terms must be construed according to their plain and commonly understood meaning.").

■ The Court is mindful, however, that notice under a "claims made" policy must be made with sufficient specificity. *McCullough v. Fidelity & Deposit Co.*, 2 F.3d 110, 112 (5th Cir.1993); *see also Resolution Trust Corp. v. Artley*, 24 F.3d 1363, 1368 (11th Cir.1994) (noting that specificity is required); *Continisio*, 17 F.3d at 68 (expansive reading of notice provisions is inappropriate). Relaxing the notice requirement, allowing coverage to be triggered by broadly phrased, innocuous, or non-specific statements, would permit an unbargained-for expansion of the policy, undermining the key distinguishing characteristic of a claims made policy—reduced exposure for the insurer and lower premiums for the insured. *McCullough*, 2 F.3d at 112; *see also LaForge*, 37 F.3d at 583 (noting that an extension of the notice provision to future policy periods would " 'constitute an unbargained-for expansion of coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy' "); *Strip*, 868 F.2d at 187 ("To allow coverage beyond that period would be to grant the insured more coverage than he bargained for and paid for, and to require the insurer to

---

6. This interpretation is buttressed by the exclusionary clause commonly contained in "claims made" policies. *South Macomb Disposal Auth. v. American Ins. Co.*, 225 Mich. App. 635, 653, 572 N.W.2d 686 (1997) (noting that insurance contracts should be viewed as a whole and read to give meaning to all its terms). For example, the policy at issue states that it does not apply to:

> any actual or alleged Wrongful Act occurring prior to the inception date of the first Securities Broker/Dealer's Errors and Omissions policy issued to the securities broker/dealer . . . and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a claim or suit.

1998–99 Policy, Exclusion (e). Thus, under this type of exclusionary clause, if Sigma had changed insurance carriers after the 1998–99 policy, or if AIG had terminated the policy, claims related to the sale of MCA securities would clearly be excluded under the new policy. Notice, therefore, was essential to preserve coverage under the policy at issue (1998–99). The correspondence between Plaintiff and Defendant, during the 1998–99 policy period, clearly indicates that Sigma could have reasonably foreseen that the separate sales of MCA securities "could" lead to a claim or lawsuit. For example, the February 24, 1999 letter from Sigma stated: "You have been placed on notice by SIGMA Financial Corporation . . . that there may be claims made against them in regards to the above referenced matters [MCA matters]." Def.'s Br. Exh. C. The same letter stated: "However, it is anticipated that some or all of those types of actions [class action, individual claims, etc.] will be filed over the next one to five years, or more." *Id.* Sigma's March 25, 1999 letter to AIG further stated: "To the best of my knowledge, no formal complaint has been filed to date against any of the broker/dealer committee members. However, it is only a matter of time before such claims will be filed." Def.'s Br. Exh. J.

provide coverage for risks not assumed."); *FDIC v. Caplan,* 838 F.Supp. 1125, 1129–30 (W.D.La.1993). As noted by the Third Circuit Court of Appeals, permitting broadly phrased notice would provide a "perverse incentive" for insured parties:

> Taking the FDIC's argument to its logical conclusion would result in a situation where the bank directors and officers would be better served to disguise potential claims so that they would be covered by insurance well into the future while not drawing attention to conduct that might increase future premiums, or terminate coverage altogether.

*Continisio,* 17 F.3d at 68 (quoting *American Cas. Co. v. FDIC,* 821 F.Supp. 655, 664 (W.D.Okla.1993)).

Thus, in this case, the Court must first determine, pursuant to the clear terms of the "Special Reporting Provision," whether Sigma became aware of "any occurrence which [might] reasonably be expected to give rise to a claim against [it] for a Wrongful Act." Def.'s Br. Exh. A, Special Reporting Clause. If so, the Court must then determine whether notice was given, and if so, whether it was made with sufficient specificity pursuant to the "Special Reporting Clause," which required notice of "the nature of the occurrence and specifics of the possible Wrongful Act." [7]

*Id.* If both requirements are satisfied, the unambiguous terms of the contract dictate that all claims arising from this occurrence would be limited, by terms of the "Special Reporting Provision," and the terms of exclusion "j" of the 1999–2000 policy, to the $9 million aggregate limit specified in the 1998–99 policy. Specifically, exclusion "j" states that the 1999–2000 policy does not apply:

> to any claim arising out of the facts alleged; or arising out of the same or related Wrongful Acts alleged or contained, in any claim which has been reported, or in *any occurrence of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time.*

Def.'s Br. Exh. B, Exclusion j (emphasis added).

This determination does not undercut the Court's previous determination that the sale of MCA product did not constitute "continuous, repeated or interrelated Wrongful Acts." The notice provision constitutes a prerequisite for coverage. If Sigma became aware of an "occurrence" which may give rise to a claim for a Wrongful Act, notice was required to effectuate coverage. However, the claims arising from this occurrence would not neces-

---

7. In fact, because notice of potential claims is a prerequisite to coverage under the policy, failure by Sigma to provide sufficient notice of the occurrence during the 1998–99 policy year would result in a complete loss of coverage with respect to the MCA related claims. *LaForge,* 37 F.3d at 584 ("Because the notice of claim provision defines coverage under this policy, the only reasonable interpretation of the policy provision is that the insureds must regard the information they possess as a potential claim and formally notify their insurer ... that a claim may be asserted."); *McCullough,* 2 F.3d at 112 (holding that notice, under a similar provision, was required to trigger coverage). A contrary result—allowing Sigma, at its discretion, to effectuate coverage by giving notice of the occurrence, or, in the alternative, by failing to give adequate notice of the occurrence and then subsequently obtaining coverage based upon actual claims filed in subsequent policy years—would give Sigma the power to unilaterally alter the insurance contract, resulting in an unbargained for expansion of the contract, effectively destroying the very purpose and benefits of a claims-made policy. However, because AIG does not contest that adequate notice of the occurrence was provided by Sigma during the 1998–99 policy year, and because the Court, upon reconsideration, concludes that the notice was sufficiently specific, the issue of a complete lack of coverage is moot.

sarily give rise to a series of continuous, repeated or interrelated Wrongful Acts; the sale of the MCA product involved different Sigma representatives, different MCA products and different purchasers, thus, the actual individual claims arising out of this occurrence are not "continuous, repeated, or interrelated" as contemplated under the policy.

**(i) Sigma was aware of an occurrence which would reasonably be expected to give rise to a claim based on the sale of MCA product**

The correspondence between Plaintiff and Defendant during the 1998–99 policy period, clearly indicates that Sigma became aware of an occurrence which reasonably could be expected to give rise to a claim based upon the individual sales of MCA product. For example, the February 24, 1999 letter from Sigma's counsel to AIG stated: "You have been placed on notice by SIGMA Financial Corporation . . . that there may be claims made against them in regards to the above referenced matters [MCA matters]." Def.'s Br. Exh. C. The same letter stated that although "no class action has been filed, no SEC administrative or injunctive proceeding has been initiated, and no individual claims have been filed . . . it is anticipated that some or all of those types of actions will be filed over the next one to five years, or more." *Id.* Moreover, counsel's March 25, 1999 follow-up letter to AIG stated: "To the best of my knowledge, no formal complaint has been filed to date against any of the broker/dealer committee members. However, it is only a matter of time before such claims will be filed." Def.'s Br. Exh. J. Clearly, the language contained in the correspondence indicates that Sigma anticipated that lawsuits would be filed as a result of the financial demise and ultimate bankruptcy of MCA.

**(ii) Sigma's letters to AIG during the 1998–99 policy year were made with sufficient specificity pursuant to the Special Reporting Clause**

As noted *supra,* notice under a "claims made" policy must be made with sufficient specificity. The notice provision in this case echoes this general understanding. The "Special Reporting Clause" states that written notice shall be given to AIG, describing "the nature of the *occurrence* and the *specifics* of the possible Wrongful Act." (Def.'s Br. Exh.'s A, B) (emphasis added).

Clearly, notice can neither be hidden in renewal applications and broad financial disclosures, nor merely recite the policy's notice provision. *See LaForge,* 37 F.3d at 584 (renewal application listing questionable loans and the insurer's subsequent change in coverage deemed insufficient because disclosure was made in a document seeking continuation of coverage, not a document seeking recovery under policy; insured downplayed problems with loans; and subsequent change in coverage was a reasonable business decision); *McCullough,* 2 F.3d at 112–13 (call-reports which described loan losses and footnote in Company's annual financial report referring to a cease and desist order issued to a subsidiary deemed insufficient—"[n]otice of an institution's worsening financial condition is not notice of an officer's or director's act, error, or omission"); *St. Paul Fire,* 993 F.2d at 158–60 (renewal application noting substandard assets and extensions of credit beyond legal lending limit did not create effective notice because it lacked specificity—the application described general financial problems, not occurrences or potential claims); *Caplan,* 838 F.Supp. at 1130 (mere recitation of the policy's notice provision and identification of potential plaintiff insufficient to satisfy policy's notice provision).

■ Instead, notice from the insured must set forth sufficient facts to put a reasonable insurer on notice that events giving rise to a claim have occurred, and potential claims under the policy may be filed in the near future. *See, e.g., Interdonato,* 988 F.Supp. at 7 ("Collectively, the letters sent by [the insured] to [the insurer] during the policy period would have lead a reasonable insurer to be aware of an 'occurrence' that could give rise to a later claim under the policy for a wrongful act.").

For example, in *Interdonato,* two letters were sent to the insurer. The first merely mentioned possible director liability, noting a "potential loss resulting from dishonest and fraudulent acts of an employee committed alone or in collusion with others." *Interdonato,* 988 F.Supp. at 3. The second letter provided further detail, describing the transactions that may have resulted in wrongdoing and an investigation by the insured's internal auditors into possible wrongdoing. *Id.* The court held that these letters were sufficient to satisfy the notice provision of the policy, which required notice where the directors became "aware of any occurrence that may subsequently give rise to a claim ... for a Wrongful Act ..." *Id.* at 5, 7.

The court noted that one of the letters alerted the insurer that it was intended to provide notice under the policy. *Id.* The letters also indicated that a loss had been suffered, identified the customer whose loans might give rise to the claim, described how the loans were made, and notified the insurer that possible policy violations, unsafe lending practices and fraud may have occurred with regard to the loans. *Id.* The court noted that:

> These letters were not a mere recital of policy language or a laundry list of possible errors by the bank. These letters targeted a particular situation or in the language of the policy, 'occurrence,' and

indicated why these loans might give rise to claims. In two separate letters to [the insurer], [the insured] specifically mentioned the possibility of director liability, at one point, identifying [the defendant] as a director. Collectively, the letters sent by [the insured] to [the insurer] during the policy period would have lead a reasonable insurer to be aware of an 'occurrence' that could give rise to a later claim under the policy for a wrongful act.

*Id.* at 7.

Similarly, upon reconsideration, the Court concludes that Sigma's letters (through counsel) to AIG during the 1998–99 policy year were sufficient to satisfy the notice requirement of the Special Reporting Clause. The first letter, dated February 8, 1999, provided general notice of potential claims. The letter stated: "Please be advised that although Sigma Financial Corporation has not been 'officially' notified of any claim, we have reason to believe that a claim will be asserted against Sigma Financial Corporation [regarding MCA]. This is formal notice of a claim...." Def.'s Br. Exh. F.

Sigma's second letter described the MCA matter in significantly more detail. The letter began by repeating that AIG was on notice of potential claims: "You have been placed on notice by Sigma Financial Corporation ... that there may be claims made against them in regards to the above referenced matters [MCA matters]." Def.'s Br. Exh. C. The letter then proceeded to provide a detailed factual history of the MCA matter. The letter acknowledged that the Michigan Financial Institutions Corporation, Chase Bank, and GNMA were conducting investigations and/or audits of MCA. *Id.* The letter noted that on February 10, 1999, MCA filed for bankruptcy protection pursuant to Chapter 11 of the U.S. Bankruptcy Code, after

a conservator had been appointed. *Id.* Exhibits were attached supporting this discussion, including:

(1) memoranda documenting MCA's inability to extend its credit line which had recently expired, massive layoffs as a result of MCA's inability to acquire new financing, and that investors were "asking questions";

(2) newspaper articles discussing the "demise" of MCA, discussing the aforementioned investigations, discussing the shutdown and re-opening under a conservator of its mortgage operations, and discussing the "serious concerns ... relative to the existence and value of the mortgages and land contracts securing the lines of credit and securing the loans made," including mortgages that had been pledged as collateral to multiple third parties or mortgages pledged that "were not in existence."

The letter continued, under the heading "Potential Exposure," to document in detail the various MCA investments sold, including stock offerings, three debenture offerings, and eighty-one separate real-estate pass-through certificates ("Pools") secured by "mortgages or land contracts." *Id.* The letter noted that MCA or an affiliate acted as the trustee, grantor and servicer, in whole or in part, for these Pools, and that efforts were being made "to reduce the exposure to possible claims by investors attempting to bring the Pool's servicing current, ... with a view toward limiting losses." *Id.* The letter concluded, under the heading "Litigation," by noting that it was anticipated that some type of litigation (class action, individual lawsuits, etc.) would be filed in the next one to five years, or more. *Id.*

A third letter was sent to AIG on March 25, 1999, as a "status report." Def.'s' Br. Exh. J. The document discussed the status of MCA's bankruptcy in further detail. It also noted, once again, that although no complaint had yet been filed, "it is only a matter of time before such claims will be filed." *Id.* The letter noted that the initial amounts being expended should be credited against the deductibles, and that the matter is being aggressively attacked "to reduce exposure by resurrecting the pools as quickly as possible, so as to bring back distributions and reduce possible customer complaints." *Id.* Sigma also formally requested a claim number. *Id.* Finally, a letter dated May 12, 1999, provided a list of all registered representative who sold MCA securities for Sigma. Def.'s Br. Exh. K.

Collectively, like *Interdonato*, these letters were sufficiently specific to put a reasonable insurer on notice that events giving rise to a claim had occurred and that potential claims under the policy may be filed in the near future. All four letters were sent under separate cover. Thus, the context in which the information was provided clearly called the MCA matter to AIG's attention. *See LaForge*, 37 F.3d at 584 (noting that notice of a claim must be "clear, unequivocal, and conspicuous"). Two of the letters specifically mentioned that AIG was being placed on formal notice of a claim regarding the MCA matter; the other two indicated that they were supplements to Sigma's earlier notice.

Importantly, as in *Interdonato*, all four letters targeted a particular "occurrence," the demise of MCA and its relation to broker/dealers who sold MCA securities—the letters were not a "laundry list" of potential claims. In fact, the letters and supporting documentation provided a detailed account of MCA's financial troubles and ultimate demise, discussing not only MCA's bankruptcy, but also the serious concerns surrounding the existence and valuation of the mortgages and land contracts which secured the Pools sold by Sigma and other broker/dealers. The let-

ters also documented the specific MCA securities sold, including stock offerings, debenture offerings, and Pools, and identified the representative agents who sold the MCA securities for Sigma. Finally, and importantly, three of the letters specifically mentioned that litigation was anticipated in the near future.

The combination of these letters provided sufficiently specific information to satisfy the notice requirement of the Special Reporting Clause. AIG, as a reasonable insurer, was placed on notice that the MCA matter was expected to give rise to claims against Sigma and its registered representatives. As such, the Court finds that the terms of the Special Reporting Clause and Exclusion "j" operate to limit Plaintiff's recovery to the $9 million aggregate limit specified in the 1998–99 policy.

## II. Certification of Interlocutory Appeal is Improper

Defendant, in the event the Court denied its motion for reconsideration, seeks permission to immediately appeal the Court's Order, pursuant to 28 U.S.C. § 1292(b). Thus, based on the Court's holding *supra*, Defendant seeks permission to immediately appeal the Court's determination that the separate sales of MCA product cannot be considered "continuous, repeated or interrelated Wrongful Acts" under the policies at issue.

■ Title 28 U.S.C. section 1292(b) provides, in relevant part:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b). The decision to certify an appeal pursuant to section 1292(b) is left to the sound discretion of the district court. *Brown v. City of Oneonta*, 916 F.Supp. 176, 180 (N.D.N.Y.1996); *Zygmuntowicz v. Hospitality Investments, Inc.*, 828 F.Supp. 346, 353 (E.D.Pa.1993).

■ In order to obtain permission to immediately appeal the Court's Order pursuant to section 1292(b), the movant must establish that the order (1) involves a controlling question of law; (2) for which there is substantial ground for difference of opinion respecting the correctness of the decision; and (3) for which an immediate appeal would materially advance the ultimate termination of the litigation. *Vitols v. Citizens Banking Co.*, 984 F.2d 168, 170 (6th Cir.1993).

■ Federal law expresses a strong policy against piecemeal appeals. *Zygmuntowicz*, 828 F.Supp. at 353. As such, permission to appeal pursuant to section 1292(b) should only be granted in exceptional circumstances. *Vitols*, 984 F.2d at 170 (citation omitted); *see also Durant v. Servicemaster Co. Trugreen, Inc.*, 147 F.Supp.2d 744, 752 (E.D.Mich.2001) (interlocutory appeal "exists only for exceptional situations where an immediate appeal may prevent protracted litigation"). Section 1292(b) "was not intended merely to provide review for difficult rulings in hard cases." *United States Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir.1966).

■ Contract interpretation is generally considered to be a question of law for the court. *Campbell v. Potash Corp. of Saskatchewan, Inc.*, 238 F.3d 792, 797 (6th Cir.2001). However, as recently noted by the Seventh Circuit Court of Appeals, "the question of the meaning of a contract though technically a question of law when there is no other evidence but the written contract itself, is not what the framers of section 1292(b) had in mind." *Ahrenholz*

*v. Board of Trustees of the University of Illinois,* 219 F.3d 674, 676 (7th Cir.2000) (citing *Downey v. State Farm Fire & Casualty Co.,* No. 00–8009 (7th Cir. May 18, 2000)). Instead, controlling questions of law involve abstract legal issues, "rather than merely [issues] that might be free from a factual contest. The idea was that if a case turned on a pure question of law, something the court of appeals could decide quickly and cleanly without having to study the record, the court should be enabled to do so without having to wait until the end of the case." *Id.* at 676–77.

■ The Court concludes, consistent with *Ahrenholz,* that the Court's interpretation of the insurance policy, although a question of law, is not a controlling question of law as contemplated by section 1292(b). A review of this Court's determination that the separate sales of MCA product were not "continuous, repeated or interrelated" is not a pure question of law; the Sixth Circuit would necessarily have to conduct a detailed study of the record, immersing itself in the specific contract language of the "claims made" policy and applying this interpretation to the unique facts of the case.

■ Moreover, AIG has not met is burden with regard to whether immediate appeal would materially advance the ultimate termination of the litigation. AIG makes the bare assertion that: "If the order is set aside and it is determined that all of the MCA-related claims are covered under the 1998–99 policy and its $1 million limit, this entire case would be over. For the most part, Sigma's remaining claims would be moot." Def.'s Br. at 14. Although the determination whether immediate appeal would materially advance the ultimate termination of the litigation necessarily involves predictions concerning the litigations outcome, the movant "must advance something more than mere conjecture that certification would substantial-

ly reduce time and expense." *Zygmuntowicz,* 828 F.Supp. at 353.

AIG has not met this burden. As noted by Sigma, several of its claims may survive a reversal of this Court's interpretation of the contract—including, but not limited to, Count III (Silent Fraud); Count VI (Detrimental Reliance); Count VIII (Bad Faith); Count X (Gross Negligence, Wanton and Willful Misconduct and Breach of Fiduciary Duty); Count XI (Michigan Consumer Protection Act); and Count XII (Violations of Michigan Insurance Code of 1956 and the Uniform Trade Practices Act). As such, a trial may result on several of Sigma's remaining claims in this action regardless of the outcome of an interlocutory appeal. *See Brown,* 916 F.Supp. at 180 (declining to certify immediate appeal in part because numerous other outstanding claims would remain). Accordingly, the Court, in its discretion, declines to certify the issue for immediate appeal.

## CONCLUSION

Based on the above reasoning, the Court GRANTS IN PART and DENIES IN PART Defendant's motion for reconsideration. The Court finds no palpable defect, as required by Local Rule 7.1(g)(3), with regard to whether the lawsuits brought against Plaintiff were based on "continuous, repeated or interrelated Wrongful Acts." Upon reconsideration, the Court grants Defendant's motion for reconsideration as to the applicable policy years, holding that Plaintiff's recovery is limited to the $9 million aggregate limit specified in the 1998–99 policy. Finally, the Court DENIES Defendant's motion for permission to immediately appeal the Court's Order, pursuant to 28 U.S.C. § 1292(b).

SO ORDERED.