**SIMPSON & CREASY, P.C. and Neil A. Creasy, Plaintiffs and Counter Defendants,**

v.

**CONTINENTAL CASUALTY COMPANY, Defendant and Counter Claimant.**

**Case No. CV409–202.**

United States District Court, S.D. Georgia, Savannah Division.

March 14, 2011.

---

Ronald C. Berry, Ronald C. Berry, PC, Savannah, GA, for Plaintiffs and Counter Defendants.

Benjamin C. Eggert, Richard A. Simpson, Wiley Rein, LLP, Washington, DC, Linda B. Foster, Weissman, Nowack, Curry & Wilco, PC, Atlanta, GA, for Defendant and Counter Claimant.

## *ORDER*

WILLIAM T. MOORE, JR., District Judge.

Before the Court is Defendant and Counter Claimant Continental Casualty Company's ("Continental") Motion for Summary Judgment. (Doc. 23.) Plaintiffs and Counter Defendants have filed a response in opposition (Doc. 27.) and an objection (Doc. 30) to an unrelated magistrate judge's order (Doc. 26) denying them leave to amend their answer to the counterclaim. For the reasons that follow, Defendant's motion is **GRANTED,** and the Court finds the objection to the magistrate judge's order to be without merit.

## BACKGROUND

This case was removed to this Court on December 30, 2009 from the Superior Court of Chatham County, Georgia on the basis of diversity jurisdiction. (Doc. 1.) Plaintiffs' complaint asserts claims for declaratory relief and bad faith against its professional liability insurer. (Doc. 1, At-

tach. 1.) Continental answered the complaint and also asserted a counterclaim against Plaintiffs for declaratory judgment. (Doc. 7.) A brief summary of the facts underlying this action and the related legal action by Plaintiffs' former client is warranted.

Continental issued a professional liability policy ("Policy") to Plaintiff Simpson & Creasy, P.C. for the period of April 1, 2009 to April 1, 2010. (Doc. 23, Attach. 2 ¶ 1; Doc. 29 ¶ 1.) The Policy is a Claims Made and Reported type, meaning that coverage is provided "only to those claims that are *both* first made against the insured *and* reported in writing to the Company during the policy period." (Doc. 23, Attach. 2 ¶¶ 2–3; Doc. 29 ¶¶ 2–3 (emphasis added).) Defendant contends that a claim was asserted against Plaintiffs no later than August 2008, well before the Policy's April 1, 2009 coverage inception date. (Doc. 23, Attach. 1 at 1.) To the contrary, Plaintiffs contend that Defendant is legally obligated to provide both a defense and coverage under the Policy. (Doc. 1, Attach.¶ 9, 14.)

The alleged claims underlying this cause of action relate to Plaintiffs' prior transactions with Ms. Cynthia F. Permenter, who filed an action against Plaintiffs in the Superior Court of Chatham County on October 26, 2009 in case number CV–09–2448–FR ("Permenter Action"). (Doc. 1 ¶ 1; Doc. 1, Attach. 1 ¶ 261; Doc. 7 ¶¶ 1, 4.) Mr. Permenter became troubled with Plaintiffs in late July of 2008, when she terminated her professional relationship with Plaintiffs and revoked their authorization to act on her behalf. (Doc. 23, Attach. 2 ¶ 8; Doc. 29 ¶ 8.) Plaintiffs first notified Defendant of the preceding events on October, 28, 2009 by reporting the filing of the Permenter Action. (Doc. 23, Attach. 2 ¶ 29; Doc. 29 ¶ 29.) Eventually, Continental denied coverage by letter on November 17, 2009. (Doc. 23, Attach. 2 ¶ 30; Doc. 29 ¶ 30.) Because the parties disagree over whether coverage was provided under the Continental policy, this litigation ensued. The factual developments between July 2008 and October 2009, as well as the legal implications of those events, are the focus of this action. These events are discussed in greater detail throughout the analysis below.

## ANALYSIS

After reviewing the standard for a motion for summary judgment, the Court will address the substantive issues.

### I. *SUMMARY JUDGMENT STANDARD*

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (*quoting* Fed. R.Civ.P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *DeLong Equip. Co. v. Wash. Mills Abrasive Co.,* 887 F.2d 1499, 1505 (11th Cir.1989).

As the Supreme Court explained:

[A] party seeking summary judgment always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the nonmovant's case. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. *Matsushita,* 475 U.S. at 587–88, 106 S.Ct. 1348. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. *See, e.g., Tidwell v. Carter Prods.,* 135 F.3d 1422, 1425 (11th Cir.1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." *Barfield v. Brierton,* 883 F.2d 923, 933–34 (11th Cir.1989).

## II. *POLICY TYPE & DEFINITIONS*

As noted above, the Policy provided coverage "only to those claims that are *both* first made against the insured *and* reported in writing to the Company during the policy period." (Doc. 23, Attach. 2 ¶¶ 2–3; Doc. 29 ¶¶ 2–3 (emphasis added).) The parties do not dispute that the policy period in this case is from April 1, 2009 to April 1, 2010. (Doc. 23, Attach. 2 ¶ 1; Doc. 29 ¶ 1.) Plaintiffs reported the Permenter Action within the Policy period. No dispute exists as to whether or when

Defendant received notice of the Permenter Action. As the parties have framed the issues in this case, the existence of coverage will hinge upon when a claim against Plaintiffs was "first made." As commentators have noted, "The problem of 'when' a claim is 'first made' has become an important issue in recent years as liability insurers have searched for ways to minimize their liability exposure." Eric Mills Holmes and John Alan Appleman, *Appleman on Insurance Law and Practice* § 130.3 (2010). This case exemplifies that trend.

A claims made and reported type policy is to be distinguished from a traditional "occurrence" type policy normally issued for personal types of insurance. In occurrence policies, coverage is "triggered either by an injury caused by what the policy defines to be an occurrence, or such an occurrence, taking place during the policy period." Robert D. Goodman et al., *New Appleman Law of Liability Insurance* § 1.07 (2010). Instead, under a claims made and reported policy, "a claim notified to the insured during a policy period must be reported to its insurer during the same policy period or an Extended Reporting Period before the policy will provide coverage." *Id.*

■ Thus, coverage is contingent on "the claim being made *and* reported to the insurer *during* the policy period." *Serrmi Prods., Inc. v. Ins. Co. of Pa.,* 201 Ga.App. 414, 415, 411 S.E.2d 305 (1991) (emphasis added). For a claims made policy, Georgia cases require that "the negligent or omitted act is discovered and brought to the attention of the insurer within the policy term." *Id.* at 414, 411 S.E.2d 305. As a state policy matter, Georgia courts have indicated that enforcement of the terms of such insurance contracts prevents an undesirable result:

If a court were to excuse the insured from the reporting requirement or to allow an extension of reporting time after the end of the policy period and any extended reporting period, such is tantamount to an extension of coverage to the insured gratis, something for which the insurer has not bargained. This extension of coverage, by the court, so very different from a mere condition of the policy, in effect rewrites the contract between the two parties.

*Id.* at 415, 411 S.E.2d 305 (internal brackets omitted). While an occurrence policy provides for coverage even if notice of the claim is received outside of a policy period, a claims made and reported policy does not. Gerald P. Dwyer, Jr., *Appleman on Insurance Law and Practice* § 4.04[4][d][1] (2010). However, this drawback is not without a corresponding benefit to the insured: in claims made policies, risk exposure is terminated at a fixed point and, as a result, "underwriters may more accurately predict an insurer's potential liability. This decreased risk allows insurers to supply claims made policies at a lower price, thereby benefitting insureds." *Id.*

■ "In a diversity jurisdiction case, the court applies the substantive law of the state in which the case arose." *Azar v. Nat'l City Bank,* 382 Fed.Appx. 880, 884 (11th Cir.2010) (unpublished). Because this case is based in diversity jurisdiction, this Court will look to the laws of Georgia for guidance in interpreting this contract, as that is the state law governing this dispute. "Under Georgia law, contracts of insurance are interpreted by ordinary rules of contract construction. . . . Where the terms are clear and unambiguous, and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent." *Burkett v. Liberty Mut. Fire. Ins. Co.,* 278 Ga.App. 681, 682, 629 S.E.2d 558 (2006). Where the terms of an insurance contract

are unambiguous, as is the case here, "the plain meaning of such terms must be given full effect, regardless of whether they might be beneficial to the insurer or detrimental to the insured." *Tripp v. Allstate Ins. Co.,* 262 Ga.App. 93, 96, 584 S.E.2d 692 (2003).

An analysis of the definitions utilized in this insurance contract and those absent from it is required. First, this insurance policy defined a claim in a very specific manner. The parties have repeatedly cited this provision in their briefing, each preferring to emphasize different portions of the definition. The Policy's insuring agreement covers

*damages* and *claim expenses* because of a *claim* that is both first made against the *Insured* and reported in writing to the *Company* during the *policy period* by reason of an act or omission in the performance of *legal services* by the *Insured* or by any person for whom the *Insured* is legally liable. . . .

(Doc. 29, Attach. 1 at 3 (emphasis in original denoting defined terms).) Elsewhere in the policy, the term "claim" is defined to mean "a demand, including the service of suit or the institution of any alternative dispute resolution proceeding, received by the *Insured* for money or services arising out of an act or omission, including *personal injury,* in the rendering of or failure to render *legal services.*" (*Id.* at 5. (emphasis in original denoting defined terms).)

■ When a definition is absent from the policy, Georgia courts strive to "give the word its ordinary meaning," and can even resort to dictionary definitions "consistent with the plain meaning of the phrase in the policy." *Dixon v. Home Indem. Co,* 206 Ga.App. 623, 625, 426 S.E.2d 381 (1992); *see also* O.C.G.A. § 13–2–2(2) ("Words generally bear their usual and common signification; but technical words, words of art, or words used in a

particular trade or business will be construed, generally, to be used in reference to this peculiar meaning."). Also not defined in this policy is the word "demand." For a succinct definition of the usual and ordinary meaning of this word in an unambiguous insurance contract, a well-regarded dictionary has been consulted, which defines demand as "The assertion of a legal or procedural right." *Black's Law Dictionary* 462 (8th ed. 2004).

## III. DEFENDANT'S MOTION

Defendant has moved for summary judgment on the basis that the

> undisputed facts establish that Ms. Permenter asserted a claim against Mr. Creasy by, at the latest, August 2008, because Ms. Permenter: (1) terminated Mr. Creasy's representation of her; (2) hired counsel to investigate Mr. Creasy's alleged wrongdoing in connection with the sale of stock and her house; (3) asserted that Mr. Creasy misappropriated her property and demanded that he owed her money, as admitted by Mr. Creasy himself; (4) demanded that Mr. Creasy execute a tolling agreement, which specifically acknowledged that Ms. Permenter possessed claims against Mr. Creasy; and (5) notify his professional liability insurer.

(Doc. 23, Attach. 1 at 2.) While the parties agree in general terms as to the timeline preceding the instant litigation, they heavily dispute the implications of those facts and the inferences that can be appropriately drawn from them.

■ Plaintiffs deny that any of these events constituted the making of a claim as that term has been defined by the policy. If Plaintiffs are correct, Defendant's motions should be denied. If, however, Defendant can show that no material facts are in dispute as to whether a claim was made before the Policy's inception by any one of the five events above, then summary judgment should be granted in favor of Defendant. An examination of the evidence in the record as to each of the five incidents is required to determine whether a genuine issue of material fact exists as to whether a claim existed, as that term is defined in the policy, at the time of the cited event.

### A. Termination of Representation & Demand

Plaintiff Creasy was terminated as Ms. Permenter's counsel by a faxed letter, which stated:

> Neil,
>
> As of 7/18/08, I am firing you as my attorney. Do not represent me on any transactions from this date forward. Send my complete file including my copy of your retainer and the hourly rate I signed. Send my complete file to the address below.

(Doc. 23, Attach. 2 ¶ 8, Doc. 29 ¶ 8.) At deposition, Ms. Permenter specified the justification for this termination: "I wanted my file. I wanted to find out what had happened to my *money and my stock.*" (Doc. 23, Attach. 5 at 27 (emphasis added).) Plaintiff Creasy also admits to the contents of a voicemail from Ms. Permenter that followed. Although the specific contents of that communication are not included in the record, Plaintiff Creasy's own summary indicates that Ms. Permenter "wanted to settle our accounts" and "wanted some money ... wanted me to send her some money ... and she wanted me to sell her stock, and give her some money." (Doc. 23, Attach. 6 at 20, 35–36.)

Plaintiff Creasy responded to Ms. Permenter's voicemail via letter. (Doc. 23, Attach. 6 at 36.) In this letter, Plaintiff Creasy characterized the contents of the voicemail as sounding "like I owe you money" and stating that he "would like nothing better than to finally settle our accounts."

(Doc. 23, Attach. 7 at 2.) Subsequent portions of this letter indicate that Plaintiff Creasy complied with the demand for services contained in the July 2008 fax. Plaintiff Creasy "enclosed several documents reflecting the balances" and promised to "send [Ms. Permenter] whatever additional information may be needed once [he] could process everything." (Doc. 23, Attach. 7 at 3.) The letter also included "copies of statements on the brokerage account for the past year and a half or so." (*Id.*) As for the client matter file, Plaintiff Creasy claimed it was "too voluminous to ship to [Ms. Permenter]" and invited her "to send someone to the office or come by yourself" to receive "those portions to which you are entitled." (*Id.*) Shortly after this letter was written, Plaintiff Creasy was contacted by Mr. Permenter's recently hired counsel, Mr. Randolph. (Doc. 23, Attach. 6 at 36.)

Defendants point out that the policy defines a "claim" as "a demand ... received by the Insured for money or *services* arising out of an act or omission, including personal injury, in the rendering of or failure to render legal services." (Doc. 29, Attach. 1 at 5 (emphasis added).) The policy also defines "legal services" rather broadly, to include

"A. Those services, including pro bono services, performed by an *Insured* for others as a lawyer, arbitrator, mediator, title agent, or other neutral fact finder or as a notary public. Any title agency or company, on whose behalf the *Insured* acts as a title agent or designated issuing attorney, is not an *Insured* under this Policy;

B. those services performed by an *Insured* as an administrator, conservator, receiver, executor, guardian, trustee or in any other fiduciary capacity and any investment advice given in connection such services;

C. those services performed by an *Insured* in the capacity as a member, director or officer of any professional legal association, including any Bar Association and any similar organization or association, its governing board or any of its committees."

(Doc. 29, Attach. 1 at 6 (emphasis in original denoting defined terms).)

This activity, occurring in July 2008, constitutes a claim as that term has been defined by the policy, nearly nine months before the Policy period even began. Under the clear Policy language, these events constituted a demand for services. The files and documentation requested arise out of legal services, especially given how broadly the Policy defines it. *See Cont'l Cas. Co. v. Jewell, Moser, Fletcher, & Holleman, P.A.,* 2005 WL 1925964, at *2 (E.D.Ark. Aug. 11, 2005) (unpublished) (interpreting a request for production of client files as a demand for services under an identical definition of a "claim"). This serves as an independent basis for granting Defendant's motion.

### B. *Hired Counsel's Investigation into Alleged Wrongdoing*

The undisputed facts indicate that, over the course of the next several months, Ms. Permenter's subsequent counsel, Tyler Lee Randolph, was in contact with Plaintiffs on several occasions. (Doc. 23, Attach. 2 at ¶¶ 10–24; Doc. 29 ¶¶ 10–24.) In a letter dated August 1, 2008, Mr. Randolph sent Plaintiffs a letter, which included the following paragraph:

Importantly, regarding any remaining assets of Cindy's you hold, to include but not limited to the 313,128 shares of Crdentia stock you have stated you currently hold and the E-trade account in which they are held, though I understand you might dispute whether they are hers or yours we respectfully re-

quest they be changed to reflect both your name and her name as owners, that both signatures (yours and hers) be required for any disposition thereof, and that she be granted access to the records thereof.

(Doc. 23, Attach. 2 ¶ 11; Doc. 29 ¶ 11.) Again, this constituted a demand for services by Ms. Permenter and was sufficient to comprise a "claim" as that term has been defined in the Policy. Ms. Permenter, through her counsel, demanded that Plaintiff Creasy perform services by altering how assets were titled. Again, the activities questioned by this letter amount to legal services under the Policy's defined terms. This, too, serves as an independent basis for granting summary judgment to Defendant.

### C. Execution of Tolling Agreement

On August 21, 2008, Plaintiff Creasy and Ms. Permenter, through Mr. Randolph, originally entered into a tolling agreement, which had an effective date of July 31, 2008. (Doc. 21, Attach. 13 at 2–5.) In a subsequent writing, this tolling agreement was extended to April 30, 2009. (Doc. 23, Attach. 20 at 2.)

The first recital of this Agreement stated, "WHEREAS, the Parties deem it to be in their mutual benefit that *Claimant's alleged Claims ("Claims") against Defendant not be asserted in litigation at the present time.*" (Doc. 23, Attach. 13 at 2.) Although the parties cite and point to a variety of other language in this agreement and accompanying communications, including conditional language of "if any," "alleged," and others, the legal significance of this document does not change. By Plaintiff Creasy's own admission, "[n]ot executing the tolling agreement would merely have caused Ms. Permenter's attorneys to have filed the complaint sooner." (Doc. 23, Attach. 12 at 10.) Accordingly, execution of this agreement and the related

statements also serve as an independent basis for granting Defendant's motion.

### D. Demand to Notify Professional Liability Insurer

An August 15, 2008 letter from Mr. Randolph to Mr. Creasy included the following paragraph:

*Malpractice/Liability Insurance:* Once again, I know we are in the early stages of mutual investigation and ascertaining of facts. However, pursuant to O.C.G.A. § 33–3–28 and in order to ensure our client's interests are adequately protected, we respectfully request that you provide your insurer's information and that you notify them of this particular matter. Certainly, as I know has been done in other similar matters in the past, you can advise them nothing has been formally filed and that you are in the process of working informally to address these matters.

(Doc. 23, Attach. 2 ¶ 14; Doc. 29 ¶ 14.) The referenced code section requires that the "insured, within 30 days of receiving a *written request from a claimant* or the *claimant's attorney,* shall disclose to the claimant or his attorney the *name of each known insurer which may be liable to the claimant upon such claim.*" O.C.G.A. § 33–3–28(a)(2) (emphasis added). Subsequently, Plaintiffs complied with this request in their responsive letter, which stated, "since I am furnishing you the same information you would obtain from the carrier should you contact them, I hope you will honor this request" to refrain from contacting Continental at that time. (Doc. 23, Attach. 2 ¶ 15; Doc. 29 ¶ 15.)

Plaintiff argues that their responsive letter and Mr. Randolph's reply somehow obviated the need to contact Defendant regarding Plaintiffs and Ms. Permenter's activities at that time. However, compliance with that requirement indicates just

the opposite. The request for insurer information by Mr. Randolph triggered a statutory duty to respond. The statutory framework referenced by the letter imposed a duty to disclose every insurer which "may be liable to the claimant upon such *claim.*" O.C.G.A. § 33–3–28(a)(2). Thus, the obvious implication of compliance with the statutory request is that a claim has been made by this time.

Plaintiffs attempt to recast and alter the legal significance of this notice with evidence of subsequent communications between Plaintiff Creasy and Mr. Randolph. However, these communications are actually only more damaging to Plaintiffs' position. A letter from Plaintiff Creasy to Mr. Randolph dated August 18, 2008 stated "so far as I know Cindy's only claim has been that I owe her money. I am not aware of a potential malpractice claim, so notice to our carrier would be premature at this time." (Doc. 26, Attach. 11 at 3.) Later in the letter, Plaintiff Creasy indicates that he would not be contacting Defendant and requested that Mr. Randolph do the same.

Regardless of subsequent events and professional cordiality surrounding the statutory demand, the initial request for information and invocation of the statute remains unchanged. A compulsory statutory obligation arose and was satisfied. These arguments do not alter the legal conclusion of the Court and miss the critical point that these communications admit essential elements of a claim as defined by the Policy. These letters admit that Ms. Permenter was requesting money and that these were related to legal services because they involved Plaintiff Creasy acting in a "fiduciary capacity" for Ms. Permenter, which is included in the definition of legal services in the policy.

## IV. BAD FAITH

Plaintiffs' complaint included, as the second count, a claim for "bad faith." (Doc. 1,

Attach. 1 ¶¶ 16–19.) The factual contents beneath this count are sparse. Other than incorporating previous paragraphs of the complaint, the only new information provided in this count relates to damages and attorney's fees. (*Id.*) Nonetheless, the Court has interpreted this claim as one arising out of O.C.G.A. § 33–4–6. Under that statute, if an insurer refuses in bad faith to pay a loss within an allotted time after demand has been made by the insured, the insurer becomes potentially liable for the loss, an additional percentage as a penalty, and attorney's fees. *Id.* § 33–4–6(a).

However, further discussion of the merits of the bad faith claim is not required. As Defendant's reply correctly states, Plaintiffs' response to this Motion for Summary Judgment appears to wholly ignore the claim for bad faith. (Doc. 32 at 2 ("Plaintiffs do not dispute that Continental never committed bad faith.").) Indeed, Plaintiffs never address bad faith in their responsive motion. (Doc. 28.) Instead, the substantive portion of its response begins and concludes with a discussion of declaratory judgment, which is discussed in the previous Part of this order.

■ Plaintiffs initiated the instant insurance coverage litigation approximately two weeks after Defendant denied coverage. (Doc. 23, Attach. 1 at 17; Doc. 1, Attach. 1 at 1–2.) The Permenter Action was not reported to Continental until October 28, 2009; this litigation commenced on December 1, 2009. (Doc. 1 at 1; Doc. 23, Attach. 2 ¶ 29; Doc. 29 ¶ 29.) However, the strictly construed requirements of bad faith in Georgia require that demand for payment precede the filing of suit by at least sixty days. *Progressive Cas. Ins. Co. v. Avery,* 165 Ga.App. 703, 703, 302 S.E.2d 605 (1983); *Guarantee Reserve Life Ins. Co. v. Norris,* 219 Ga. 573, 575, 134 S.E.2d 774 (1964). The Court finds that Defen-

dant has demonstrated the absence of any "genuine dispute as to any material fact" and that, therefore, Defendant "is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). Additionally, the Local Rules of this District require a response to motions for summary judgment within twenty-one days after service of the motion. S.D. Ga. L.R. 7.5. Although Plaintiff has contested the motion as it pertains to the declaratory judgment claim, its response wholly ignores the bad faith count. (Doc. 59.) "Failure to respond within the applicable time period shall indicate that there is no opposition to a motion." S.D. Ga. L.R. 7.5. For the reasons above, Defendant's motion is **GRANTED** as to the bad faith claim.

## V. *OBJECTION TO MAGISTRATE JUDGE'S ORDER*

The Court has reviewed and considered Plaintiffs' "Objections to Magistrate's Order Denying Motion to Amend Answer to Counterclaim." (Doc. 30.) After careful consideration, the Court finds that no part of that order is "clearly erroneous or is contrary to law." Fed.R.Civ.P. 72(a).

## CONCLUSION

Defendant's Motion for Summary Judgment on both Plaintiffs' causes of action is **GRANTED.** Plaintiffs' objections to the magistrate judge's order are without merit. The Clerk of Court is **DIRECTED** to close this case.