PHYSICIANS INSURANCE COMPANY OF WISCONSIN, INC., DBA PIC WISCONSIN, APPELLANT, v. GLENN WILLIAMS, RESPONDENT.

No. 54126

June 28, 2012                                       279 P.3d 174

*Lewis & Roca LLP* and *Daniel F. Polsenberg, Joel D. Henriod*, and *Jacqueline A. Gilbert*, Las Vegas, for Appellant.

*Hutchison & Steffen, LLC*, and *Michael K. Wall* and *Todd L. Moody*, Las Vegas, for Respondent.

---

Before CHERRY, C.J., GIBBONS and PICKERING, JJ.

## OPINION

By the Court, PICKERING, J.:

This appeal involves the interpretation of a claims-made professional liability insurance policy that appellant Physicians Insurance Company of Wisconsin, Inc., d.b.a. PIC Wisconsin (PIC), issued to nonparty dentist Hamid Ahmadi, D.D.S. The policy covers dental malpractice claims made against Dr. Ahmadi and reported to PIC during the policy period. On cross-motions for summary

judgment, the district court determined that PIC received constructive notice of respondent Glenn Williams's malpractice claim against Dr. Ahmadi while the policy was in force and held that this was enough to trigger coverage. Our review is de novo, *Powell v. Liberty Mutual Fire Ins. Co.*, 127 Nev. 156, 161, 252 P.3d 668, 672 (2011) (citing *Farmers Ins. Exch. v. Neal*, 119 Nev. 62, 64, 64 P.3d 472, 473 (2003) (insurance policy interpretation presents a question of law); *Wood v. Safeway, Inc.*, 121 Nev. 724, 729, 121 P.3d 1026, 1029 (2005) (summary judgment review is de novo)), and we reverse.

## I. *FACTS*

Williams recovered a $480,260 default judgment against Dr. Ahmadi. His complaint alleged that, without his knowledge or consent, Dr. Ahmadi used street cocaine to anesthetize Williams's gums during a 2002 root canal. A short time later, Williams sideswiped a residential gas meter while driving a cement truck for work. His employer subjected him to a mandatory drug test, which came back positive for cocaine. Williams had never used cocaine, and he asked Dr. Ahmadi if the root canal medications might have caused a false-positive test result. Dr. Ahmadi acknowledged the possibility and wrote Williams's employer to suggest this explanation for the positive drug test result, but the employer was unconvinced. As a result, Williams lost his job and his 20-year career as a union truck driver.

The PIC policy had a retroactive date of April 13, 1998, and, through renewals, its coverage extended to April 14, 2004. Williams filed suit against Dr. Ahmadi on April 15, 2004, the day after the PIC policy expired. Earlier, on February 6, 2004, while the policy was still in force, Williams sent Dr. Ahmadi a demand letter by certified mail. Dr. Ahmadi neither responded to Williams nor alerted PIC to the demand or the suit that followed. Five months after the policy expired, Williams, through his lawyer, made demand directly on PIC.

Meanwhile, Dr. Ahmadi's personal and professional life had spun out of control. In December 2003, California authorities arrested him for possession of 57.8 grams (roughly two ounces) of cocaine and charged him with drug trafficking. A month later, the Nevada State Board of Dental Examiners obtained a stipulated order suspending his dentistry license. And on April 13, 2004, Washington authorities arrested Dr. Ahmadi for prescribing painkillers to himself in phony patient names.

PIC learned about Dr. Ahmadi's meltdown anecdotally. An entry in its file log dated January 20, 2004, notes: "Joanie heard on news last nite that [Dr. Ahmadi] has been charged w/ giving pa-

tients cocaine.'' Around the same time, Dr. Ahmadi reported an office burglary in which expensive equipment was stolen (PIC also insured this risk). Because there were no signs of forced entry, PIC became suspicious and hired an investigator. The investigation turned up, among other things, two brief newspaper accounts of Dr. Ahmadi's drug-trafficking arrest. One article reported that Dr. Ahmadi told the arresting officers that he did not sell cocaine but kept it for personal use and for use in his dental practice and that the Nevada State Board of Dental Examiners was ''investigating the allegations that Ahmadi used cocaine himself and if he used it on his patients.''[1] The second article reported that Dr. Ahmadi's dental license had been suspended. PIC received fax copies of the articles in March 2004; a few days later, PIC obtained a copy of the stipulated order suspending Dr. Ahmadi's license.

Dr. Ahmadi's license suspension gave PIC grounds to cancel the policy and/or to assess an additional premium for continued coverage.[2] On April 2, 2004, PIC gave Dr. Ahmadi written notice of cancellation ''due to the change in the status of your dental license as ordered by the Nevada State Board of Dental Examiners.'' It offered Dr. Ahmadi renewal coverage through June 2, 2004, and an extended reporting endorsement or ''tail'' coverage beyond that, contingent on Dr. Ahmadi paying additional premiums of $199 and $2,862, respectively. Dr. Ahmadi paid neither, and the policy expired on April 14, 2004.

When Williams later made direct demand on PIC, the company took the position that coverage did not exist because the claim had not been made and reported during the policy period. Williams responded by filing the suit underlying this appeal. After discovery, the district court granted in part and denied in part the parties' cross-motions for summary judgment. The district court held that Williams did not have a direct right of action against PIC to enforce his default judgment against Dr. Ahmadi. Nonetheless, it granted Williams declaratory relief, holding that Williams's claim had been made and reported during the policy period:

> In consideration of the language used in the policy in place, the totality of the information in the possession of [PIC], coupled with the nature of the information and the manner in

---

[1] The Nevada State Board of Dental Examiners interviewed Dr. Ahmadi's staff early on. One saw Dr. Ahmadi cook and smoke cocaine at work, while others reported weight loss and bizarre mood swings.

[2] Section H.1. of the policy states that ''any [official] inquiry or action affecting your license to provide professional health care services . . . may result in our need to assess an additional premium charge or to restrict, or cancel all, coverages provided by this policy.''

which it was received, constitutes a timely claim having been made on behalf of Mr. Williams pursuant to the terms of the claims-made professional dental liability insurance policy.

PIC appeals.[3]

## II. *DISCUSSION*

The PIC policy is a claims-made-and-reported malpractice policy. For coverage, a claim must be made and reported within the policy period. In granting Williams declaratory relief, the district court focused on the policy's definition of "claim" without considering its insuring agreement clause and related provisions. This was error, in that the decision interpreted "claim" more broadly than the policy's language reasonably allows and effectively recast the policy from a claims-notice policy to an occurrence-notice policy. A court may not rewrite a policy under the guise of construing it. *See Griffin v. Old Republic Ins. Co.*, 122 Nev. 479, 483, 133 P.3d 251, 254 (2006).

### A. *Occurrence versus claims-made coverage*

An occurrence-based policy provides broader coverage but at greater cost to the insured than a claims-made policy. Under an occurrence policy, "it is irrelevant whether the resulting claim is brought against the insured during or after the policy period, as long as the injury-causing event happens during the policy period." 1 Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 8.03[a], at 638 (15th ed. Supp. 2011). "By contrast, the event that invokes coverage under a 'claims made' policy is transmittal of notice of the claim [during the policy period] to the insurance carrier." *Zuckerman v. Nat. Union Fire Ins.*, 495 A.2d 395, 406 (N.J. 1985).

Claims-made policies come in several varieties. "The most restrictive type of claims-made policy is one that requires not only that the claim be both made and reported to the insurer during the policy period, but also that the claim arise out of wrongful acts that take place after the inception of the policy and during

---

[3]Although Williams did not cross-appeal the order denying him standing to directly enforce the Ahmadi default judgment against PIC, PIC does not argue that this disables Williams from defending his declaratory judgment as to timeliness. Also, neither side argued in the district court that issues of fact precluded summary judgment as to timeliness. *See Schuck v. Signature Flight Support*, 126 Nev. 434, 436, 245 P.3d 542, 544 (2010) (a party opposing summary judgment on the grounds that disputed issues of fact exist must identify them in the district court).

the policy period." Ostrager & Newman, *supra*, § 4.02[b], at 165. Some claims-made-and-reported policies contain "awareness" or "discovery" provisions. Such provisions "allow the insured to report *potential* claims or events, acts or circumstances that the insured reasonably believes may give rise to a claim against it in the future." *Id.* at 166. This affords an insured "additional protection for a claim or suit that may not be brought until years after the policy has expired, as long as the insured provided notice to the insurer, during the policy period, of the facts, circumstances, or events out of which the claim or suit arises." *Id.*

The limited-coverage drawback of claims-made insurance "is not without a corresponding benefit to the insured: in claims made policies, risk exposure is terminated at a fixed point and, as a result, 'underwriters may more accurately predict an insurer's potential liability. This decreased risk allows insurers to supply claims made policies at a lower price, thereby benefitting insureds.'" *Simpson & Creasy, P.C. v. Continental Cas. Co.*, 770 F. Supp. 2d 1351, 1355 (S.D. Ga. 2011) (quoting Gerald P. Dwyer, Jr., *Appleman on Insurance Law and Practice* § 4.04[4][d][1] (2010)).

> The knowledge that after a certain date the insurer is no longer liable for newly reported claims under a claims-made policy enables the insurer to fix its reserves more accurately for future liabilities and to compute premiums with greater certainty. By limiting the maximum "tail" exposure period, the insurer also avoids the increased risks associated with future inflation, the prospect of increasing jury awards, and unanticipated changes in the substantive law. Thus, the premiums on claims-made policies can be set at lower rates than comparable coverage under an occurrence form.

Ostrager & Newman, *supra*, § 4.02[b], at 162-63 (citations omitted) (internal quotation marks omitted); *see American Cas. Co. v. Continisio*, 17 F.3d 62, 68 (3d Cir. 1994) ("Claims-made policies are less expensive because underwriters can calculate risks more precisely since exposure ends at a fixed point.").

The Nevada Legislature has recognized that claims-made insurance plays an important role in meeting health care provider demand for affordable malpractice insurance. Thus, NRS 690B.210 defines "[c]laims-made policy" as "professional liability insurance [for health care providers] that provides coverage only for claims that arise from incidents or events which occur while the policy is in force and which are reported to the insurer while the policy is in force." Such coverage is valid subject to the insurer complying with NRS 690B.200 through NRS 690B.370. Williams makes no argument that PIC or its policy violated Nevada law or public policy.

## B. *The insuring agreement*

As this is a coverage dispute, our analysis starts with the policy's insuring agreement clause. In the PIC policy this clause is entitled "Coverage Agreement" and states:

> This is a claims-made policy. . . .
>
> . . . .
>
> We will pay on your behalf damages that you are legally obligated to pay because of any professional health care incident that: (i) began on or after the Retroactive Date, and (ii) arose from professional health care services provided by you . . . , and (iii) resulted in a claim that is first received by you and reported to us during the policy period pursuant to Section H.2. What To Do If You Have A Claim of this policy.

Section H.2., "What To Do If You Have A Claim . . . ," spells out the specific information the insured must provide in order to report a claim:

> a. In the Event Claim is Made Against You, you must give us written notice, as soon as practicable, but in no event more than fifteen (15) days after the expiration of the policy period. In your written notice, you must include the date, time and place of the professional health care incident; a description of the professional health care services you provided; a description of the professional health care incident; the name, address and age of the claimant or plaintiff; the names of witnesses, including other treating health care providers.

Williams sent his demand letter to Dr. Ahmadi by certified mail on February 6, 2004. By its terms, the policy required Dr. Ahmadi to give PIC written notice of the Williams demand, including in the notice a description of the health care incident; its "date, time and place"; a description of the health care services provided; and the name and contact information of the claimant and any witnesses. But Dr. Ahmadi did not notify PIC of Williams's demand, and Williams did not redirect it to PIC until months after the policy expired. By the express terms of its insuring agreement clause, the policy thus does not cover the Williams claim, because it was not reported to PIC during the policy period. *See Nat'l Union Fire Ins. Co. v. Baker & McKenzie*, 997 F.2d 305, 307-08 (7th Cir. 1993) (upholding judgment for the insurer on a claims-made-and-reported professional liability policy where the claim was made against the insured during one policy period but not reported to the insurer until later); *F.D.I.C. v. Barham*, 995 F.2d 600, 605 n.9 (5th Cir. 1993) (declining to "read-out" of the claims-made-and-reported policy its explicit notice requirements).

An extended reporting endorsement was available to Dr. Ahmadi that, had he purchased it, would have covered the Williams claim. Thus, when PIC wrote Dr. Ahmadi on April 2, 2004, to cancel the policy because his license had been suspended, it offered him extended reporting or "tail" coverage under Section C.2. of the policy, which states:

> Extended Reporting Coverage (This is an Optional Coverage).
>
> . . . .
>
> > a. Extended Reporting Coverage for Cancellation or Non-Renewal
> >
> > If your policy is canceled or non-renewed for any reason, you have the right to purchase extended reporting coverage. If you do not purchase extended reporting coverage, you will not have coverage for claims that you first report to us after the end of the policy period, except for those claims that were first received by you during the policy period and reported to us pursuant to Section H.2. What To Do If You Have A Claim of the policy.

But the cost of this coverage was $2,862, and Dr. Ahmadi did not purchase it. Thus, the second sentence of Section C.2.a. applies: "If you do not purchase extended reporting coverage"—Dr. Ahmadi did not—"you will not have coverage for claims that you first report to us after the end of the policy period"—*e.g.*, the Williams claim—"except for those claims that were first received by you during the policy period and reported to us pursuant to Section H.2."—none were.[4]

"We will not rewrite contract provisions that are otherwise unambiguous [or] 'attempt to increase the legal obligations of the parties where the parties intentionally limited such obligations.'" *Griffin*, 122 Nev. at 483, 133 P.3d at 254 (quoting *Senteney v.*

---

[4] Neither side raised a notice-prejudice argument in the district court or does so on appeal. *See LVMPD v. Coregis Insurance Co.*, 127 Nev. 548, 555-58, 256 P.3d 958, 963-65 (2011); *compare* Ostrager & Newman, *supra*, § 4.02[c], at 200 ("[M]any courts have declined to extend the notice-prejudice rule to claims-made policies."), *and id.* § 4.02[b], at 168 ("Because the reporting of a claim to the insurer during the policy period is one of the essential terms of a claims-made policy, a failure to give timely notice should be less excusable under a claims-made policy than it would be under an occurrence policy."), *with Pension Trust Fund v. Federal Ins. Co.*, 307 F.3d 944, 956-57 (9th Cir. 2002) (holding that the notice-prejudice rule does not apply to claims-made-and-reported policies because, in that context, "notice is the event that actually triggers coverage"). We do not reach these questions here because they were neither briefed nor argued.

*Fire Ins. Exchange*, 101 Nev. 654, 656, 707 P.2d 1149, 1150-51 (1985)). Dr. Ahmadi did not pay for the extended reporting endorsement that would have covered the Williams claim, and it is unfair to conscript such coverage judicially. *See Continisio*, 17 F.3d at 68 ("'an extension of the notice period in a "claims made" policy constitutes an unbargained-for expansion of coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy'" (emphasis omitted) (quoting *Zuckerman v. Nat. Union Fire Ins.*, 495 A.2d 395, 406 (N.J. 1985))).

### C. *Definitions section: actual and potential claims*

Williams concedes that PIC did not receive actual notice of his demand for damages against Dr. Ahmadi while the policy was in force. Nonetheless, he persuaded the district court that the news accounts of Dr. Ahmadi's disintegration, combined with Dr. Ahmadi's license suspension, gave PIC constructive notice of a potential claim during the policy period and that this was enough to trigger coverage under the third alternative definition of "claim" that appears in the PIC policy's definitions section. That section states:

Claim—means:

(1) the receipt by you of a demand for damages arising from a professional health care incident, including service of suit, demand for arbitration or any other notice of legal action for damages; or

(2) your transmittal to us of an oral or written report from you regarding a professional health care incident that is reasonably likely to give rise to a demand for damages; or

(3) the receipt by us of an oral or written report from someone other than you regarding a professional health care incident that is reasonably likely to give rise to a demand for damages.

NOTE: A claim received by you must be reported to us pursuant to Section H.2. What To Do If You Have A Claim.

In Williams's view, a newscast or other public report of an insured's professional misconduct—as a dentist using street cocaine to anesthetize his root canal patients would be—qualifies as a "claim" under subparagraph 3 above.[5] Going further, he maintains

---

[5]PIC argues that issues of fact as to causation and whether Williams's claim is excluded by its policy's "intentional, criminal or malicious act or omission" exclusion remain, if this case is not resolved on the basis of timeliness.

that the requirement that the insured report actual claims in compliance with Section H.2.a. of the policy inherently does not apply to third-party reports of potential claims which, by definition, come from "someone other than" the insured.

But the "claim" definition is not self-contained. Its key terms, "professional health care incident" and "damages," also carry specific definitions, which convey a requirement that, for an insured's or a third-party's "report" of a potential "demand for damages" to qualify as a "claim," it must include specific information about a specific wrongful act and consequent injury to a patient. Thus, the policy defines "professional health care incident" to mean "any act or omission in the furnishing of professional health care services to any one person" and "damages" as "all amounts of money that are payable because of physical or mental injury, sickness or disease sustained by any person." The references are singular and specific, not generalized.[6] And the word "report" that is used in subparagraphs 2 and 3 of the "claim" definition, while not defined, is also used in the insuring agreement clause and the extended reporting clause in the context of a claim *"reported* to us during the policy period pursuant to Section H.2." (Emphasis added.) The repeated references to "report" and "reporting" denote more in the way of formal contact between the insurer and the insured or the reporting third party than generalized newspaper notice. *Compare Continisio*, 17 F.3d at 69 ("[b]ecause notice of a claim or potential claim defines coverage under a claims-made policy . . . the notice must be given through formal claims channels"; joining "a growing line of cases prohibiting an insured from insisting that its insurer's underwriting department sift through a renewal application and decide what should be forwarded to the claims department on the insured's behalf" (internal quotation marks omitted)), *with* XIII Oxford English Dictionary 651 (2d ed. 1989) (defining "report" as "[t]o give in or render a formal account or statement of or concerning (some matter or thing); to make a formal report on; to state (something) in such a report").

The parties do not cite, and our research has not turned up, a published decision interpreting the precise "claim" definition used in the PIC policy. In allowing an insured's or a third party's report of a potential demand for damages to qualify as a "claim," the PIC policy's second and third alternative definitions of "claim" represent a type of "awareness" or "discovery" clause, for they

---

[6]"Professional health care services" is also a defined term. It is defined as "any services rendered in your health care practice, as defined in the Practice Endorsement attached to this policy, provided the person rendering health care services has all licenses required to render the services, and each license is current and valid."

"afford[ ] coverage for claims made after the policy expires if, during the policy period . . . the insurer [is put] on notice of acts/omissions/circumstances that might lead to a future claim" or, as here, demand for damages. 3 Allan D. Windt, *Insurance Claims & Disputes: Representation of Insurance Companies and Insureds* § 11:5 (5th ed. Supp. 2012). Because "[t]he notice requirement in a discovery clause serves to actually trigger the coverage," it is generally held that the insurer must receive "actual, as opposed to constructive, notice[;] . . . absent policy language leading to a different result, a discovery clause should not be [deemed] satisfied unless the insurer was put on notice of specifics." *Id.* (footnote omitted).

The brief news accounts of Dr. Ahmadi's bizarre (and self-serving) explanation to the California Highway Patrol of his reason for possessing two ounces of street cocaine (if they bought his story, he would face mere possession, as opposed to trafficking, charges) did not constitute a "report" to PIC of an "act or omission in the furnishing of professional health care services to any one person" that is "reasonably likely to give rise to a demand for damages." The news accounts mentioned a practice that, if actually engaged in, was illegal and wrong. However, they did not identify when the practice occurred, whether patients suffered injury as a result, and if so, who the injured patient(s) were and what their anticipated injuries might be. *Compare City of Harrisburg v. Intern. Surplus Lines Ins.*, 596 F. Supp. 954, 959-60 (M.D. Pa. 1984) ("A newspaper article written and published [about an event], intended to be read by the general public, does not" provide adequate specifics to give notice of a claim under a claims-made policy; without more, "the insurer would have no way of knowing that a claim for coverage was being made" or was expected.), *aff'd*, 770 F.2d 1067 (3d Cir. 1985), *with Owatonna Clinic—Mayo Health v. Medical Protective*, 639 F.3d 806, 811 (8th Cir. 2011) (affirming judgment imposing liability on a claims-made malpractice insurer who received notice during the policy period that its insured was being investigated by the Minnesota Board of Medical Practice; in contrast to the notice in this case, the notice in *Owatonna* identified the five patients whose care the medical board was investigating and specified in fair detail the specific deviations from the standard of care and the injuries suffered by the patient seeking to impose liability on the insured doctor).

Without specifics, the news accounts of Dr. Ahmadi's disintegration differ little, analytically, from the omnibus notice the trustee of a bankrupt law firm attempted to give the firm's claims-made malpractice carrier in *Home Insurance Co. v. Cooper & Cooper, Ltd.*, 889 F.2d 746, 750 (7th Cir. 1989), or the hypothetical considered in *McCullough v. Fidelity & Deposit Co.*, 2 F.3d 110, 112 (5th Cir. 1993), of a claims-made insurer with notice that

its insured attorney is a free spirit who has abandoned calendaring. In neither instance are there enough specifics provided to qualify as a report of a potential demand for damages under the policy's discovery clause. As Chief Judge Easterbrook wrote in rejecting the bankruptcy trustee's blanket notice of law firm incompetence as insufficient under the policy's discovery clause, "If the trustee had reason to believe that the firm's work *in a given case* would lead to liability, it was entitled under the policy to inform the insurer within the period of coverage and so ensure indemnity if the potential came to pass." *Home Ins. Co. v. Cooper & Cooper*, 889 F.2d at 750 (emphasis added). But "[a]n effort to lodge claims on everything, to extend indefinitely the coverage of a 15-month policy, has no similar effect; it is merely vexatious." *Id.*; *accord McCullough*, 2 F.3d at 112 ("if notice that an insured attorney has a poor docket control system is accepted as coverage triggering notice of the attorney's wrongful act, the attorney's malpractice coverage would be triggered for any number of suits predicated on missed deadlines," which is an unreasonable interpretation of a claims-made policy's discovery clause; the insurer must receive "notice of specified wrongful acts to trigger coverage").

"[A]llowing coverage to be triggered by broadly phrased, innocuous, or non-specific statements, would permit an unbargained-for expansion of the policy, undermining the key distinguishing characteristic of a claims made policy—reduced exposure for the insurer and lower premiums for the insured." *Sigma Financial v. American Intern. Specialty*, 200 F. Supp. 2d 710, 718 (E.D. Mich. 2002); *see California Union Ins. v. American Diversified Sav.*, 914 F.2d 1271, 1274-75 (9th Cir. 1990) ("The term 'claim' should not be interpreted so broadly as to include a regulatory agency's request of the insured to comply with regulations where, as here, the agency did not directly threaten [the insured] with liability."); *KPFF, Inc. v. California Union Ins. Co.*, 66 Cal. Rptr. 2d 36, 45 (Ct. App. 1997) ("Reports based upon speculation or rumor do not rise to the level of notice of a claim under the awareness [or discovery] provision.").[7]

For a "report" of a potential demand for damages to qualify as a "claim" requires sufficient specificity to alert the insurer's claim

---

[7]Williams suggests that PIC's knowledge of Dr. Ahmadi's misconduct imposed a duty to investigate that would have led it to the Williams claim, since Williams was part of the Nevada State Board of Dental Examiners investigation. As *KPFF* recognizes, however, the duty to investigate is an extension of the duty of good faith and fair dealing that the insurer owes its insured and, in a claims-made-and-reported policy, extends to the handling of reported claims, not claims that the insurer might unearth. *KPFF*, 66 Cal. Rptr. 2d at 45.

department to the existence of a potential demand for damages arising out of an identifiable incident, involving an identified or identifiable claimant or claimants, with actual or anticipated injuries. This interpretation harmonizes the claim definition with the other provisions of the policy, including its insuring agreement clause, *reprinted supra* section II.B, which requires the insured to provide specifics concerning an actual claim for coverage to attach. *See Mut. Real Estate Holdings, LLC v. Houston Cas. Co.*, No. 10-cv-236-LM, 2011 WL 3841931, at *5 (D.N.H. Aug. 30, 2011) ("Ignoring the 'Insuring Agreement' section is not a reasonable way to interpret [a claims-made] policy.").[8] While an ambiguous term in an insurance policy is construed against the insurer, the term "should not be viewed standing alone, but rather in conjunction with the policy as a whole." *Fourth St. Place v. Travelers Indem. Co.*, 127 Nev. 957, 963, 270 P.3d 1235, 1239 (2011). So read, we do not find an ambiguity that would permit us to construe the PIC policy to have been triggered by the public information provided PIC in this case.

We therefore reverse and remand with instructions to enter summary judgment in favor of PIC.

CHERRY, C.J., and GIBBONS, J., concur.

---

[8]Because we resolve this case on the basis that the information provided was insufficiently specific to constitute a "claim," and because the parties do not argue the issue, it is unnecessary to decide whether the report of a potential claim, *i.e.*, the occurrence notice, must be followed by notice of the actual claim, as the insuring agreement clause suggests. This issue has divided other courts and remains open. *Compare Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 369 (7th Cir. 1990) (rejecting the argument that the "occurrence notice and claim notice" provisions of a claims-made-and-reported policy "are alternative rather than sequential requirements" as "contrary to the language and evident purpose of the [policy's express reporting] requirements. The insurer wants to know whether there is a possibility that it will be receiving a claim after the policy period, but of course it also wants to receive notice of that claim when and if it materializes."), *with Continental Ins. Co. v. Metro-Goldwyn-Mayer, Inc.*, 107 F.3d 1344, 1347 (9th Cir. 1997) (insureds were not required to give notice of an actual claim against them if they had given sufficient notice of the specific wrongful act that could lead to a claim under a discovery or awareness provision).